In the

# United States Court of Appeals
## For the Seventh Circuit

No. 13-3634

LULA DIXON, Independent Administrator of the Estate of Kevin P. Dixon,

*Plaintiff-Appellant*,

*v.*

COUNTY OF COOK, KATINA M. BONAPARTE, and NEWWORLD EBOIGBE,[1]

*Defendants-Appellees*.

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 09 C 6976 — **Thomas M. Durkin**, *Judge*.

ARGUED OCTOBER 26, 2015 — DECIDED APRIL 8, 2016

Before WOOD, *Chief Judge*, and BAUER and SYKES, *Circuit Judges*.

---

[1] When this suit began, Mr. Eboigbe was known as Nathan Omeke. He changed his name to Newworld Eboigbe, and so we use that name in this opinion. Some of the filings spell his last name with an initial "A," but it appears that this was in error.

WOOD, *Chief Judge*. In September 2008 Kevin Dixon was sent to the Cook County jail as a pretrial detainee. A month later, he developed severe and persistent pain in his back and abdomen. In early December, he had a CT scan that revealed a paratracheal mass. Over the next few weeks, the mass grew rapidly. Medical personnel at the jail were aware of the problem, but they accused Dixon of malingering, gave him over-the-counter analgesics, and ordered him to seek psychiatric care. By January 5, 2009, Dixon's condition had deteriorated severely. He was finally taken to Stroger Hospital, where he was diagnosed with lung cancer. He died two months later.

Acting in her capacity as the Independent Administrator of Dixon's Estate, Lula Dixon (Dixon's mother) sued Cook County, as well as Dr. Katina Bonaparte and Nurse Newworld Eboigbe, who had overseen Dixon's care at the jail's Cermak Acute Care Facility. (We refer to plaintiff as Lula, and to her son as Dixon. Lula also sued several corrections officers, but the district court dismissed her claims against them and she has not appealed from that ruling.) Lula asserted claims under 42 U.S.C. § 1983 for deliberate indifference to Dixon's serious medical condition in violation of the Eighth and Fourteenth Amendments to the Constitution, and state-law claims for intentional infliction of emotional distress. In response to the defendants' motions, the district court dismissed the claims against defendants Bonaparte and Eboigbe under Federal Rule of Civil Procedure 12(b)(6); it later granted summary judgment in Cook County's favor, and this appeal followed.

## I

For purposes of both Rule 12(b)(6) and Rule 56, we take the facts as alleged and view them in the light most favorable to Lula. See *Tamayo v. Blagojevich*, 526 F.3d 1074, 1081 (7th Cir. 2008); *Shields v. Ill. Dep't of Corrections*, 746 F.3d 782, 786 (7th Cir. 2014). The only difference is that the facts before us are limited to those in the complaint for the Rule 12(b)(6) ruling, and they include the full summary judgment record for the Rule 56 ruling.

Dixon was arrested and taken to the jail on September 5, 2008. His symptoms began to bother him in October. In response to his complaints, he was sent to the jail's Cermak Health Services facility, where he had a chest x-ray on December 10 and a follow-up CT scan the next day. The tests revealed a paratracheal tumor (that is, a tumor next to his trachea). On December 15, a Cermak physician's assistant referred Dixon for an "urgent" pulmonary consultation. The word "urgent" did not have much force: eight days later, Dixon met with a pulmonologist. He reported intermittent pain for the past two months, which he rated at 10 out of 10 for severity. The pulmonologist reviewed the December 11 scan, ordered another CT for January 2, 2009, and scheduled a follow-up appointment for January 6.

But Dixon could not wait that long for treatment. By December 30, he was experiencing intense abdominal pain, difficulty breathing, difficulty moving his legs, and an inability to use the toilet. As he lay on the floor in partial paralysis after falling from his bunk, a corrections officer informed Nurse Eboigbe of his condition. Eboigbe took no action; instead, the guard scheduled Dixon for "sick call" three days later. Later that day, another nurse relieved Eboigbe of his

shift and got Dixon admitted to the Cermak Acute Care Facility. Despite the documentation of his tumors (which because of the records problem we discuss below might have been unknown to the people staffing Acute Care), the physician's assistant at the Acute Care facility thought that Dixon was malingering and so ordered a psychiatric consultation.

On December 30 and 31, Dixon received additional CT scans, which revealed growth of the tumor and fecal matter in his colon. At that point Dr. Bonaparte, the supervisor of the hospital ward, first saw him. Dr. Bonaparte did not have instant access to Dixon's medical records and previous CT and x-ray results, because there was a backlog in the system for scanning medical records into the Cook County system. Nor did she have Dixon's paper medical records in front of her. She knew about his tumor, but she did not recall making any effort to find out about the results of the December 30 tests. Critically, she knew that more information was available but proceeded without collecting it. She agreed with the physician's assistant (based on the incomplete records before her) that a psychiatric consult was in order to rule out malingering. She ordered that, as well as a second consultation with a pulmonologist; she marked the latter request "RUSH." She noted that she would see him again three days later.

The next day, January 1, Cermak nurses reported that Dixon was on the floor and had soiled himself. He complained that he could not walk. On January 2, he was taken for the follow-up CT ordered by the first pulmonologist. The notes from that scan described the tumor as "6 x 4 cm in the left upper lung lobe which extends to the level of the aortic arch and invades the mediastinum and posterior chest wall"

and stated, "[f]indings are most indicative of malignant neoplasm." The scan also identified a 12 x 9 mm nodule in the right upper lobe that was likely metastatic and appeared to extend into the spinal canal. The notes also mentioned emphysema and bullous changes in both lungs.

Less than two hours after these words were written, Dr. Bonaparte discharged Dixon from Cermak. She ordered that Dixon be allowed to use his wheelchair only for transport; he was not permitted to use it inside the jail. He was given Motrin, but no other pain medication.

Three days later, Dixon was brought back to Cermak with severe weakness in his legs, bladder and bowel incontinence, and pressure sores on his right buttock. The physician who saw him on his arrival transferred him to Stroger Hospital, where he remained until he received compassionate release from Cook County custody and went home, where he died on March 4, 2009, officially from lung cancer. This suit followed.

## II

Lula's lawsuit focuses on the fact that it took 26 days for Dixon to receive palliative care from the time when the jail personnel first became aware of his tumor; she does not contend that he could have been cured with faster or better treatment. But he suffered during the period when, rather than receiving treatment for his pain, he was transferred back and forth between the county jail infirmary and a regular cell and treated as if he were faking his illness. Lula fixes the blame in several places. First, she argues that County policy resulted in such poor communication among the medical providers who saw Dixon that nobody put all the

pieces together, figured out what was wrong and how serious it was, and took appropriate steps. Second, she asserts that the individual defendants knew about (or had reason to know of) Dixon's condition and were deliberately indifferent in the face of that knowledge. We address the institutional claim first, and then the individual claims.

A

The essence of Lula's claim against the County is that it implemented a records policy that created barriers to informed care. She relies on *Monell v. Dep't of Soc. Servs. of the City of New York*, 436 U.S. 658 (1978), which requires a plaintiff suing a municipality or comparable entity to demonstrate that the entity's official policy, widespread custom, or action by an official with policy-making authority was the "moving force" behind his constitutional injury. *City of Canton v. Harris*, 489 U.S. 378, 379 (1989). An unconstitutional municipal policy can "take the form of an implicit policy or a gap in expressed policies." *Thomas v. Cook Cnty. Sheriff's Dep't*, 604 F.3d 293, 303 (7th Cir. 2009). This part of the case was resolved on summary judgment, and so the question before us is whether Lula presented enough in response to Cook County's motion to demonstrate genuine issues of material fact requiring a trial.

Lula relies primarily on Cook County's official policy with respect to medical records in the jail; to a certain extent, she also relies on "widespread custom" and action by an official with final authority. In order to prove the policy, she looks both to written records and to indirect proof. For the latter, a "plaintiff must introduce evidence demonstrating that the unlawful practice was so pervasive that acquiescence on the part of policymakers was apparent and

amounted to a policy decision." *Phelan v. Cook County*, 463 F.3d 773, 790 (7th Cir. 2006). This requires more than a showing of one or two missteps. *Id.* As applied to a case such as this one, we look to see if a trier of fact could find "systemic and gross deficiencies in staffing, facilities, equipment, or procedures" in a detention center's medical care system. And even if there are such deficiencies, a *Monell* claim can prevail only if a policy-making official knows about them and fails to correct them. *Wellman v. Faulkner*, 715 F.2d 269, 272 (7th Cir. 1983); *City of St. Louis v. Praprotnik*, 485 U.S. 112, 130 (1988).

Lula alleges that the County's records policy led inexorably to inadequate medical care for inmates. The problem was twofold: first, there were both a paper record-keeping system and an electronic record-keeping system, and the two were not coordinated; second, to the extent the County for whatever reason was still relying primarily on paper records, access to them was haphazard. The predictable result was that its medical providers were hamstrung in their ability to reach a proper diagnosis and treatment. Lula argues that if all the doctors involved in treating Dixon had access to all his records, he would not have experienced such a delay in diagnosis and thus his pain would have been addressed much sooner.

The evidence she provided includes a Department of Justice (DOJ) report condemning the inadequacy of Cook County medical care system for detainees, as well as a statement by Dr. Avery Hart, who became Chief Medical Officer at Cermak in July 2008, that new policies to correct the failures outlined in the DOJ report were not implemented until 2009, after Dixon's death. Importantly, Dr. Hart was the highest-

level County official at Cermak during Dixon's entire stay at the jail, and Dr. Hart had received direct notice from DOJ that the policies in place were highly likely to cause serious injury to the inmates. Nevertheless, no changes were made until after the events in this lawsuit occurred.

Lula also presented testimony from Dr. Cruz, the physician who ultimately transferred Dixon to Stroger Hospital. Dr. Cruz reported that he was sometimes unable to obtain access to a patient's medical records because the records had not been scanned into the electronic records database and were not otherwise readily available. In addition, Lula offered expert testimony from Dr. Robert Greifinger, the primary DOJ investigator during its 17-month investigation into the Cook County jail's healthcare system. Dr. Greifinger opined that systemic inadequacies in the County's detainee healthcare policy, including the failure to coordinate health information, caused the delay in palliative care and prolonged suffering that Dixon experienced. Although the district court struck the portion of Dr. Greifinger's Rule 26(a)(2) report in which he concluded that Dixon's care fell below the prevailing standard of care and that defendants displayed deliberate indifference (both of which the court deemed to be too conclusory), it found that Dr. Greifinger is qualified as an expert and considered the remainder of the report.

Taking the County's records policy, the evidence from Dr. Hart, the evidence from Dr. Cruz, the DOJ report, and the additional testimony from Dr. Greifinger together, we conclude that a reasonable jury could find that pervasive systemic deficiencies in the detention center's healthcare system were the moving force behind Dixon's injury. It was there-

fore error to grant summary judgment in the County's favor on the *Monell* claim.

B

1

Before we address Lula's argument that it was error to dismiss her claims against the individual defendants under Rule 12(b)(6), we must address a preliminary procedural point. The defendants argue that Lula improperly relies on facts from the summary judgment record that were not alleged in the original complaint. They have not specified, however, what exactly is new, and it is not obvious to us. In any event, a plaintiff attacking a dismissal under Rule 12(b)(6) is entitled to rely on new facts on appeal, as long as they are "consistent with the well-pleaded complaint." *Reynolds v. CB Sports Bar, Inc.*, 623 F.3d 1143, 1147 (7th Cir. 2010). Our own review of the amended complaint satisfies us that any additional facts Lula has mentioned on appeal are consistent with it. The amended complaint lays out the basis for Dixon's claims against both Dr. Bonaparte and Nurse Eboigbe: that each was aware of the seriousness of Dixon's condition, yet each was not just negligent, but deliberately indifferent to his needs. We therefore turn to the merits.

2

To state a claim for relief based on inadequate medical care while in detention, a plaintiff must demonstrate (1) an objectively serious medical condition and (2) that the defendant subjectively "acted with a 'sufficiently culpable state of mind'" in failing to provide adequate care or treatment for that condition. *Greeno v. Daley*, 414 F.3d 645, 653 (7th Cir. 2005). The parties here agree that Dixon's metastatic lung

cancer was an objectively serious medical condition. As is often the case, the debate is over the subjective element of the plaintiff's claim. That element requires the plaintiff to be able to prove facts from which something more than negligence or even medical malpractice can be inferred; the plaintiff need not, however, shoulder the burden of proving that the defendant acted or failed to act with the purpose of causing harm. *Farmer v. Brennan*, 511 U.S. 825, 835 (1994) (deliberate indifference "is satisfied by something less than acts or omissions for the very purpose of causing harm").

The amended complaint alleged that Dr. Bonaparte knew about Dixon's chest tumor no later than December 31, 2008, and yet she offered him only non-prescription pain medication, discharged him from the jail's hospital, ordered a psychiatric consult to determine if he was malingering, and ordered that his wheelchair be removed upon his arrival back at the regular jail. A jury could find, based on these facts, that her behavior was "so plainly inappropriate as to permit the inference that [she] intentionally or recklessly disregarded his needs." *Hayes v. Snyder*, 546 F.3d 516, 524 (7th Cir. 2008). It might also draw the opposite inference, if it thought that she was unable to learn about the results of Dixon's earlier tests through no fault of her own. Dixon's claim is not, however, defeated by the possibility that the most Dr. Bonaparte might have been able to do differently was to provide Dixon with six additional days of palliative care (from December 31 through January 5 when he was transferred to Stroger Hospital). Six days of intense pain cannot be considered to be *de minimis* for Eighth Amendment purposes. Furthermore, a plaintiff can state a claim of deliberate indifference even if he has a condition that may not be curable. *Williams v. Liefer*, 491 F.3d 710, 716 (7th Cir. 2007).

We make no prediction about the way this part of the case might turn out. We conclude only that Lula's amended complaint plausibly alleged enough to survive a motion to dismiss for failure to state a claim.

3

Lula's case against Nurse Eboigbe presents a closer question. In the end, however, we conclude that it is one that deserves at least the development that summary judgment would permit. Eboigbe first learned of Dixon's condition on December 30, when he was told that Dixon was experiencing intense abdominal pain, difficulty breathing, difficulty with leg movement, and incontinence. Eboigbe heard that Dixon had fallen out of his bunk and was lying on the floor of his cell, partially paralyzed. A jury could find that this was an obvious enough problem that even a layperson who discovered it would have at least consulted a doctor for instructions, and failing that would have called 911 for emergency help. Eboigbe did neither, according to the amended complaint. He did nothing: it was the guard who scheduled Dixon for "sick call" *three days* later. A different nurse later on December 30 was the one who took steps to get Dixon admitted immediately to the Acute Care Facility. Again, we stress that these are allegations; the facts are yet to be determined. But they are enough to state a claim against Nurse Eboigbe for deliberate indifference to Dixon's serious medical condition.

4

Finally, the district court dismissed Lula's state-law claims against Dr. Bonaparte and Nurse Eboigbe for intentional infliction of emotional distress because the standards

for such a claim are higher than deliberate indifference, and the court had found the latter claim insufficient. In Illinois, this tort requires a showing of (1) extreme and outrageous conduct by the defendant, (2) either intent to cause distress or knowledge that there was a high probability that the defendant's conduct would cause severe emotional distress, and (3) severe emotional distress that actually resulted. *Feltmeier v. Feltmeier*, 798 N.E.2d 75, 83 (Ill. 2003); see also *Wilson v. Norfolk & W. Ry. Co.*, 718 N.E.2d 172, 180 (Ill. 1999). The conduct must "be so extreme as to go beyond all possible bounds of decency and be regarded as intolerable in a civilized community." *Feltmeier*, 798 N.E.2d at 83. Behavior that is otherwise rude, abrasive, or inconsiderate can be intentional infliction of emotional distress if the plaintiff is particularly susceptible to emotional distress and the defendant is aware of plaintiff's susceptibility. *McGrath v. Fahey*, 533 N.E.2d 806, 811 (Ill. 1988).

We think it best for the district court to take another look at these allegations, which rely on the court's supplemental jurisdiction. See 28 U.S.C. § 1367(a). The requirement of finding "extreme and outrageous" conduct is a demanding one, and it will not be met in every instance where a plaintiff has stated a claim under the Eighth Amendment (which itself sets a high bar). The adequacy of the complaint will depend on Lula's ability to allege that the individual defendants *knew* that Dixon was not malingering and was in severe pain, and nonetheless provided no immediate respite. Without prejudging the result, we thus vacate this part of the district court's judgment as well and return it for a second look.

### III

The judgment of the district court is therefore REVERSED and the case is remanded for further proceedings consistent with this opinion.