In the

# United States Court of Appeals
## For the Seventh Circuit

_____

No. 15-2832

ALEX DANIEL,

*Plaintiff-Appellant*,

*v.*

COOK COUNTY, et al.,

*Defendants-Appellees*.

_____

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 11 C 2030 — **Jorge L. Alonso**, *Judge*.

_____

ARGUED MAY 26, 2016 — DECIDED AUGUST 12, 2016

_____

Before WOOD, *Chief Judge*, and MANION and HAMILTON,
*Circuit Judges*.

HAMILTON, *Circuit Judge*. In this appeal we address a spe-
cific piece of evidence that has divided the judges of the
Northern District of Illinois. In a number of cases, including
this one, plaintiffs have asserted that medical care at the Cook
County Jail falls below constitutional standards as a matter of
official policy, custom, or practice. The evidence question is
whether such plaintiffs may use as evidence the 2008 findings

from a U.S. Department of Justice investigation of health care at the Jail. The investigation found systemic flaws in the Jail's scheduling, record-keeping, and grievance procedures that produced health care below the minimal requirements of the United States Constitution.

If those findings are admissible for the truth of the matters asserted, they go a long way toward meeting a plaintiff's burden of proving an unconstitutional custom, policy, or practice under *Monell v. Department of Social Services*, 436 U.S. 658, 694–95 (1978). The Department of Justice Report is hearsay if used to assert the truth of its contents, and the district court held that the Report was not admissible to prove the truth of its findings. But we conclude it should be admitted under the hearsay exception for civil cases in Federal Rule of Evidence 803(8)(A)(iii) for factual findings from legally authorized investigations.

The district court granted summary judgment for defendants because the plaintiff had not offered evidence of an unconstitutional official custom, policy, or practice. We determine that he has offered sufficient evidence on summary judgment, and we therefore reverse and remand.

I. *Factual and Procedural Background*

Because we are reviewing a grant of summary judgment for defendants, we present the evidence in the record in the light reasonably most favorable to the non-moving party, plaintiff Alex Daniel, who in 2010 was a pretrial detainee at the Cook County Jail. *Rahn v. Board of Trustees of Northern Illinois Univ.*, 803 F.3d 285, 287 (7th Cir. 2015). On April 24, 2010, Daniel fell and injured his wrist while playing basketball. The bone in his wrist suffered multiple fractures.

Daniel asserts, and an orthopedic specialist agrees with him, that the treatment of his wrist was disrupted by avoidable delays that caused permanent damage to Daniel's hand and wrist. There were delays at first, but the principal concern is that the Jail and its health care staff failed to ensure that Daniel's second cast was removed on time. Leaving the second cast on too long caused permanent damage to his hand and wrist that was aggravated by a further failure to provide physical therapy.

On April 24, the day Daniel was injured, on-duty general practitioner Dr. Gawo used an elastic bandage and a sling to stabilize his wrist. This was a temporary solution, of course, and Dr. Gawo asked for Daniel to see an orthopedic specialist as soon as possible. On April 30, Daniel had yet to see an orthopedist. Accordingly, he filed a grievance with the Jail.

While Daniel waited for a response, he finally saw an orthopedist on May 10, sixteen days after his injury. The specialist, Dr. Mejia, put Daniel in a long arm cast extending from his wrist to just above his elbow. The cast was the standard treatment for Daniel's fracture, and Dr. Mejia did not think that the delay in putting on the cast was improper. Dr. Mejia wanted Daniel to return in two to three weeks for transition to a short arm cast. On June 1—the three week mark—Daniel was placed in the short arm cast. He was instructed to return in another three weeks. That did not happen; Daniel did not see an orthopedist for removal of that cast until ten weeks later, on August 12. That delay is the principal focus of this lawsuit.

In the meantime, on June 11, Daniel received the Jail's reply to his grievance. The reply said that he had been cared for properly, and Daniel appealed. "I have swelling in my fingers

and I can barely move them," he wrote. The Jail referred the matter to health administrators.

On June 22, three weeks after the short arm cast was put on, Daniel saw an unidentified practitioner. That doctor simply noted that Daniel was awaiting treatment from an orthopedist. Daniel did not see another doctor until August 3, nine weeks after his last appointment with an orthopedist. He saw Dr. Baker, a family practitioner, who wrote that Daniel was still in the cast and still needed to see an orthopedist. On August 10, Daniel again saw Dr. Baker. Daniel was "scheduled for ortho last night," Baker wrote, "but apparently not taken by security." The doctor expressed alarm that the cast had not come off yet.

In the meantime, Daniel had raised his own concerns about the delay. On July 26, he filed a second grievance: "It's been 3 months [since I broke my wrist] and I have very limited movement in fingers…. I am not receiving proper medical care or treatment…." And on August 10, after a perfunctory reply by the Jail, Daniel appealed again. "They still haven't removed my cast," he wrote, "and I still can't move [my] fingers properly."

Finally, on August 12, nearly ten weeks after receiving his short arm cast, Daniel's cast was finally removed by orthopedist Dr. Kapotas. In Dr. Kapotas's view, the immobilization had gone beyond the proper six to eight week window for a short arm cast. He recommended that Daniel see an occupational therapist to recuperate and return in a month for a check-up. That did not happen either. Daniel was scheduled for a therapy appointment on August 27 but was not seen by a therapist. He filed a third grievance that day, saying he could barely move his fingers, could not make a fist or turn

his palm upright, and was experiencing continued wrist pain. His therapy appointment was rescheduled for August 30, but that day came and went without Daniel able to visit the therapist. He was rescheduled for September 6, and again officials did not take Daniel to therapy.

Starting in late September, the Jail responded to several of Daniel's grievances. On September 30, in accepting Daniel's second grievance, the Jail asked its health administrators to address his issues. On October 4, the Jail responded to Daniel's third grievance: "patient will be rescheduled for therapy." He was not, and Daniel appealed the response to his August 27 grievance to alert the Jail. On November 9, the Jail denied the appeal, responding incorrectly: "Per CHS Admin seen/therapy 9/13 – 10/25 – 10/27."

A few days before that response, on November 3, Daniel saw Dr. Kapotas again. At their last appointment on August 12, Dr. Kapotas had recommended occupational therapy and a check-up in a month. No therapy had occurred, and the follow-up was nearly three months after their first meeting. A November 3 x-ray showed that Daniel's wrist had suffered a loss in density, the onset of arthritis, and abnormal joint spacing. Daniel would later enlist an orthopedic expert, Dr. Fetter, to examine his injury in 2013. Dr. Fetter concluded that Daniel had suffered "residual and permanent stiffness of his left hand and wrist," more likely than not caused by the unduly long cast immobilization.

On March 24, 2011, Daniel filed a pro se complaint, though the district court later recruited counsel for him. In the operative version of the complaint, Daniel has sued the Cook County Sheriff's Office, Cook County Sheriff Dart in his indi-

vidual capacity, and Cook County under 42 U.S.C. § 1983 alleging violations of his Fourteenth Amendment due process rights that parallel, for pretrial detainees, the Eighth Amendment rights of prisoners to adequate health care. In support of his claim, he offered evidence from his own experience, as recounted above. He also presented extensive testimony from Jail medical staff. And finally, he offered three additional documents: the 2008 Department of Justice Report detailing systemic health care problems at the Jail, a subsequent Agreed Order that incorporated the Report's findings, and a 2010 Monitor Report that provided a detailed account of the Jail's progress in remedying the problems.

The district court granted summary judgment for the defendants. This appeal followed. We begin with the merits of Daniel's *Monell* claims under § 1983 on our review of summary judgment, without relying on the three additional documents arising from the Department of Justice investigation to prove the truth of their contents. We then address these additional documents in more detail to determine if they were incorrectly excluded as hearsay.

II. *Daniel's Monell Claims*

  A. *The Monell Claim for Inadequate Health Care*

The individual rights in our Bill of Rights have long been understood as negative rights, meaning that the Constitution protects individuals from some forms of government intrusions upon their liberty, without imposing affirmative duties on governments to care for their citizens. See *DeShaney v. Winnebago County Dep't of Social Services*, 489 U.S. 189, 196 (1989). One broad exception to this general principle applies when the government takes people into its custody so that they are

no longer able to take steps to protect their own health. *Id*. at 198–99. The Eighth Amendment's prohibition on cruel and unusual punishment requires governments not to act with deliberate indifference to serious threats to prisoners' health and safety. *Estelle v. Gamble*, 429 U.S. 97, 104 (1976); see also *Farmer v. Brennan*, 511 U.S. 825, 828–29 (1994); *King v. Kramer*, 680 F.3d 1013, 1020 (7th Cir. 2012). For people like Daniel, in government custody other than through a criminal conviction, the Due Process Clause of the Fourteenth Amendment imposes at least as robust a duty on government custodians. E.g., *Rice v. Correctional Medical Services*, 675 F.3d 650, 664 (7th Cir. 2012).

Plaintiff Daniel claims that Cook County and its Sheriff violated their duties under the Due Process Clause by acting with deliberate indifference toward his serious health needs as the result of inadequate customs and practices. The district court granted the defendants' motion for summary judgment against Daniel's suit; we review that decision *de novo*. *Jenkins v. Bartlett*, 487 F.3d 482, 492 (7th Cir. 2007). Summary judgment is appropriate only "where there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law." *Id.*

The damages remedy available under 42 U.S.C. § 1983 establishes a remedial scheme focused primarily on the responsibilities of individual government employees and agents. As applied to local governments like Cook County, the Supreme Court has interpreted § 1983 to bar *respondeat superior* liability. *Monell*, 436 U.S. at 694–95, 707.[1] Most inmates who believe

---

[1] In *Shields v. Illinois Dep't of Corrections*, we noted some of the critiques of this portion of *Monell* and noted the debate over whether the same rule

their right to health care has been violated therefore seek
damages from individual doctors or other health care profes-
sionals, or from correctional staff who might have ignored or
interfered with the inmates' efforts to seek the health care they
need. See, e.g., *Glisson v. Indiana Dep't of Corrections*, 813 F.3d
662, 668 (7th Cir. 2016) (Wood, C.J., dissenting), *vacated and re-
hearing en banc granted* (May 24, 2016). In such cases, individ-
ual defendants can defend themselves by shifting blame to
other individuals or to problems with the "system," particu-
larly where no one individual seems to be responsible for an
inmate's overall care.

In this case, Daniel has not tried to hold any one doctor
responsible for his injury. On this record, it is hard to see how
he might have done so. This case reflects a common scenario:
an institution "structured its affairs so that no one person was
responsible for [the inmate's] care," and such diffused respon-
sibility can make it very difficult to show individual respon-
sibility for health care failures. *Shields*, 746 F.3d at 795; see also
*Glisson*, 813 F.3d at 666 (majority opinion) (divided panel de-
cision, now vacated, on whether private corporation contract-
ing to provide health care for prisoners had policy amounting
to deliberate indifference to prisoners' health). Daniel con-
tends instead that the delays and confusion that caused his
injury were caused by systemic problems in the health care
system for the Cook County Jail that reflect deliberate indif-
ference to inmates' health needs as a matter of official custom,
policy, or practice.

---

should apply to private corporations whose employees act under color of
state law. 746 F.3d 782, 789–96 (7th Cir. 2014).

To hold defendants liable under § 1983 and *Monell*, Daniel must demonstrate that the defendants' "official policy, widespread custom, or action by an official with policy-making authority was the 'moving force' behind his constitutional injury." *Dixon v. County of Cook*, 819 F.3d 343, 348 (7th Cir. 2016), citing *City of Canton v. Harris*, 489 U.S. 378, 379 (1989). An unconstitutional policy can include both implicit policies as well as a gap in expressed policies. *Id.*, quoting *Thomas v. Cook County Sheriff's Dep't*, 604 F.3d 293, 303 (7th Cir. 2009).

Similar to the plaintiff's claim in *Dixon*, Daniel argues that the Jail had both an unlawful official policy and widespread custom that led to his injury. At bottom, though, he is essentially attempting to prove "that the unlawful practice"—the failure to establish adequate systems for scheduling health care, keeping health care records, and addressing inmate grievances about health care—"was so pervasive that acquiescence on the part of policymakers was apparent and amounted to a policy decision." *Id.*, quoting *Phelan v. Cook County*, 463 F.3d 773, 790 (7th Cir. 2006). We have said in general terms that an inmate can meet this burden by offering "competent evidence tending to show a general pattern of repeated behavior (*i.e.*, something greater than a mere isolated event)." *Davis v. Carter*, 452 F.3d 686, 694 (7th Cir. 2006).

Negligence on the part of policymakers is not sufficient to show deliberate indifference. *Arnett v. Webster*, 658 F.3d 742, 751 (7th Cir. 2011) (deliberate indifference "is more than negligence" and "is not medical malpractice"). In any large institution, and the Cook County Jail is very large (9,000 inmates at a time), one would expect some instances of poor health care caused by errors in scheduling and record-keeping. Yet at the same time, such instances are to be expected by both

courts and by correctional officials, whose jobs include the re-
sponsibility to design and implement systems to minimize
such errors. The challenge in litigation like this is to distin-
guish between systemic problems showing official deliberate
indifference and occasional lapses that are inevitable even in
well-run institutions.

1. *Daniel's Claim as to Medical Scheduling and Record-
   Keeping*

To prove an official policy, custom, or practice within the
meaning of *Monell*, Daniel must show more than the deficien-
cies specific to his own experience, of course. See *Thomas*, 604
F.3d at 303 (liability requires conduct in "more than one in-
stance"), quoting *Cosby v. Ward*, 843 F.2d 967, 983 (7th Cir.
1988). When seeking to rely upon indirect proof, he must
come forward with evidence that could allow a reasonable
trier of fact to find, as we said in *Dixon*, "systemic and gross
deficiencies in staffing, facilities, equipment, or procedures in
a detention center's medical care system." 819 F.3d at 348
(quotation mark omitted). If Daniel meets this mark, he must
then show that a policymaker or official knew about these de-
ficiencies and failed to correct them. *Id.*, citing *Wellman v.
Faulkner*, 715 F.2d 269, 272 (7th Cir. 1983). He need not present
evidence that these systemic failings affected other specific in-
mates. See *Davis*, 452 F.3d at 695 ("To establish a widespread
custom or policy, the plaintiff here was not required to show
that Cook County's alleged repeated pattern of delay … actu-
ally caused pain and suffering to other inmates in need of
medical intervention … .").

Even setting aside for now the 2008 Department of Justice
Report, the Agreed Order, and the Monitor Report, Daniel
provided substantial evidence of systemic deficiencies in the

Jail's medical care, including extensive testimony from Jail medical staff. Dr. Baker, the general practitioner who treated Daniel, described the difficulty in getting inmates scheduled for the health care they needed: "I mean, you can make phone calls, you can give them papers, you can write movement envelopes, you can put them in your car and drive them over. I mean, how many things can you do?" Medical records were routinely inadequate. Notes from appointments would fail to be recorded on a patient's chart. Appointments were scheduled and then rescheduled. "You never really kind of knew" when "the clinic might get canceled and they had to get rescheduled. … I want things to happen when they're supposed to happen. And there's—in any big system a lot of things, you know, don't always happen." During the period of Daniel's treatment, notes on patients "were only available in one hard-copy chart that applied to multiple patients."

To the extent there was an appointment schedule, it was haphazard. Staff would submit appointments by filing pieces of paper or simply talking to a scheduling department staffer without a written record. Dr. Kapotas noted that he would make general requests for follow-up appointments, but in practice he would simply wait for patients to turn up for treatment. This practice is reflected in Daniel's evidence of the Jail's grievance procedures, which showed delays in scheduling his follow-up care and outright errors as to whether he had ever seen an occupational therapist, as directed by Dr. Kapotas.

The evidence, viewed in the light most favorable to Daniel, raises a genuine issue of material fact as to whether his injury resulted from systemic, gross deficiencies in the Jail's medical care. His indirect evidence shows more than a mere "one or two missteps," *Dixon*, 819 F.3d at 348, or isolated problems.

Daniel has also offered substantial evidence that Sheriff Dart, who is a relevant policymaker for health care for Jail inmates, knew of these deficiencies and failed to take reasonable corrective action. We return to the three documents—the Report, the Agreed Order, and the Monitor Report—stemming from the U.S. Department of Justice investigation of health care in the Cook County Jail. The investigation concluded that medical care at the Jail fell "below the constitutionally required standards of care." The district court found that the Report was inadmissible as hearsay to the extent it was offered to prove the truth of its contents, a decision we address and disagree with below. But the district court correctly held that the Report could be offered for the non-hearsay purpose of proving the sheriff knew of the problems described in the Report. (This limited use of the document requires some rather legalistic intellectual gymnastics: the reader must consider the Report only as evidence of what the sheriff knew about the problems, but may not consider it as evidence that the problems actually existed.) The problems described by the Report must be shown, according to the district court, by other evidence, but if they are shown, the Report and related documents are evidence that the sheriff was on notice.

We are satisfied that the plaintiff has come forward with enough evidence, including his own experience and the extensive deposition testimony from Jail staff, to demonstrate systemic problems with health care scheduling and record-keeping. This is so even without the substance of the Department of Justice Report. And when we include the Report and related documents to prove notice and the apparent absence of a response by the sheriff, it would be reasonable, though

not necessary, to infer an official custom, policy, or practice of deliberate indifference toward inmates' serious health needs.

Daniel must also offer evidence of causation: that the unconstitutional custom, policy, or practice at the Jail "was the 'moving force' behind the constitutional deprivation." *Montaño v. City of Chicago*, 535 F.3d 558, 570 (7th Cir. 2008), quoting *Gable v. City of Chicago*, 296 F.3d 531, 537 (7th Cir. 2002). He has done so.

First, Daniel has presented a clear link between his inadequate treatment and his injury. Dr. Fetter—Daniel's expert— testified that the permanent stiffness in Daniel's hand "was, more likely than not, caused by the prolonged cast immobilization." Dr. Kapotas's observation that the short arm cast was removed weeks after the treatment window corroborates Dr. Fetter's conclusions.

Daniel also offers evidence that his poor treatment was the likely result of the widespread breakdowns in scheduling and record-keeping endemic at the Jail. Dr. Baker noted a failure in Daniel's treatment and the removal of his cast due to a mix-up in scheduling. In response to Daniel's later grievances that he was losing function of his hand, the Jail noted that he would be rescheduled for therapy, but there was no follow-up. The Jail would later respond, incorrectly, that Daniel had seen a therapist for his injuries. Daniel has offered sufficient evidence of a causal link between the inadequate Jail medical scheduling and record-keeping practices and the deprivation of his constitutional rights to survive summary judgment.

2.  *The Grievance System Claim*

Daniel also asserts that deficiencies in the Jail's grievance system are sufficient to support a *Monell* claim. Speaking from his own experience and the testimony he has gathered from Jail medical staff, Daniel has offered evidence that the Jail's grievance system was not reliable or timely. But the Constitution does not require that jails or prisons provide a grievance procedure at all, nor does the existence of a grievance procedure create a constitutionally guaranteed right. *Owens v. Hinsley*, 635 F.3d 950, 953 (7th Cir. 2011); *Grieveson v. Anderson*, 538 F.3d 763, 772–73 (7th Cir. 2008). The right at issue is instead a right to constitutionally adequate care.

This does not mean that problems in the grievance system are not relevant to Daniel's core claim that he was deprived of medical care by an official custom, policy, or practice. A jail or prison must have effective channels for inmates to communicate their health care needs. *Thomas*, 604 F.3d at 304 ("The dangers of delayed responses to medical requests are readily apparent…."). If those channels break down, the result may be a deprivation of needed care. If a grievance system is part of a jail's or prison's system for communicating and responding to health care requests, and if the system fails in a way that causes a deprivation of needed health care, then the problem with the grievance system may be an important part of the plaintiff's case for deliberate indifference to his health care needs. See, e.g., *Awalt v. Marketti*, 74 F. Supp. 3d 909, 936 (N.D. Ill. 2014) (denying government's motion for summary judgment for deprivation of health care resulting in death where plaintiff offered evidence that Cook County Jail personnel routinely ignored medical grievances).

Accordingly, delays in responses to Daniel's grievances do not support an independent constitutional claim, but those delays may support Daniel's other evidence that systemic problems at the Jail caused him to suffer injury as a result of official indifference. The evidence that such delays occurred further bolsters Daniel's general claim of inadequate medical treatment.

B. *Proper Defendants*

Daniel's suit names as defendants the Cook County Sheriff's Office, Cook County Sheriff Dart in his individual capacity, and Cook County itself. The Sheriff's Office argues that it cannot be liable for Daniel's injuries because it was not responsible for his medical care. Instead, all treatment was to be handled by Cermak Health & Hospitals System, which is a medical facility separate from the Jail itself. But the constitutional duty under the Eighth and Fourteenth Amendments to provide adequate health care rests on the custodian. See *Rice*, 675 F.3d at 664–65. As the district court correctly noted, a government entity "cannot shield itself from § 1983 liability by contracting out its duty to provide medical services." *King*, 680 F.3d at 1020; cf. *Estelle*, 429 U.S. at 103 (the government has "obligation to provide medical care for those whom it is punishing by incarceration"). There is also a close relationship between the Jail and Cermak. The Cermak facilities are physically located within the Jail, and Jail personnel are responsible for delivering patients to Cermak for care. Even if the care Daniel received at Cermak was inadequate, Daniel has offered evidence that the Sheriff's Office exacerbated the problems by failing to communicate with Cermak and failing to deliver Daniel to his appointments. The Sheriff's Department is therefore a proper defendant.

Sheriff Dart also argues that he cannot be liable in his personal capacity. He points out that there is no vicarious liability for supervisory officials under § 1983. This is correct but incomplete. The sheriff can be *directly* liable for Daniel's injury. If a senior jail or prison official, including a person with final policymaking power, is "aware of a systemic lapse in enforcement of a policy critical to ensuring inmate safety, his failure to enforce the policy could violate the Eighth Amendment." *Steidl v. Gramley*, 151 F.3d 739, 741 (7th Cir. 1998) (quotation marks omitted). Similarly, if a supervisor designed or is aware of the institution's "deliberately indifferent policy that caused a constitutional injury, then individual liability might flow from that act." *Armstrong v. Squadrito*, 152 F.3d 564, 581 (7th Cir. 1998).

The Department of Justice Report, along with the later Agreed Order incorporating the investigation's findings and the 2010 Monitor Report detailing the Jail's progress, provides substantial evidence that Sheriff Dart had notice of the systemic deficiencies in the Jail's health care. The totality of Daniel's evidence would allow a jury to find that these problems persisted when Daniel received inadequate care and that the sheriff did not respond reasonably to them. Daniel may proceed with his claim against Sheriff Dart in his personal capacity.

III. *Evidence Issues*

Daniel has presented a sufficient case to overcome defendants' motion for summary judgment. But it is one thing to survive summary judgment and another to prove a case at trial. This is especially so with a *Monell* claim, where it may be difficult to draw a line between occasional failings that may be

inevitable in a large institution and more widespread, intolerable failures toward which policymakers are deliberately indifferent. We therefore address a recurring question about the evidence that will be offered at trial.

In response to defendants' motion for summary judgment, Daniel presented the evidence of his own experience and, as recounted above, testimony from staff members and medical professionals at the Jail. He also offered the Department of Justice Report and the two related documents as *substantive* evidence. As noted above, the district court allowed him to use the Report and related documents to prove notice to the sheriff of the widespread problems detailed in the Report. But the court held that the Report and related documents were inadmissible hearsay to the extent Daniel offered them to prove the truth of the findings. Daniel argues that this evidence should be admissible under hearsay exceptions and that it offers strong support for his *Monell* claim of deliberate indifference to widespread, systemic problems in providing health care at the Jail. We agree in part with his arguments.

A. *The Department of Justice Investigation into Cook County Jail*

On February 16, 2007, the Department of Justice's Civil Rights Division notified the Cook County Board of Commissioners that it would be investigating conditions of confinement at the Jail. Between June 18–22, and then again from July 23–27, Department of Justice officials conducted on-site inspections of the Jail in collaboration with experts in corrections and custodial medical and mental health care, among others. The team interviewed numerous Jail officials, staff, and inmates, and reviewed extensive Jail records. Initial find-

ings were reported to the Jail in July and August 2007, including what the Department of Justice found to be "inadequate emergency key precautions and grossly unsanitary conditions."

On July 11, 2008, the Department of Justice sent a 98-page letter to Cook County Sheriff Thomas Dart and Cook County Board President Todd Stroger reporting the complete and official findings. This is the "Department of Justice Report" we have discussed. At bottom, the Department of Justice found that medical care at the Jail was constitutionally inadequate in many respects. Most relevant here, the Department of Justice found deficiencies that included "inadequate acute care," "inadequate chronic care," "inadequate record keeping," and "inadequate access to medical care."

The Department of Justice found that health care at the Jail was unacceptable. Patients "suffered needlessly because medical staff failed to ensure that inmates met scheduled appointments, failed to monitor acute conditions, and failed to treat inmates' conditions." Patients with chronic conditions also received inadequate treatment. The Jail "was deficient in ensuring that patients are seen on a regular basis … and that inmates are monitored and treated to prevent the progression of illnesses."

These shortcomings were exacerbated by an inadequate system of record-keeping. The Department of Justice Report determined the Jail failed to "maintain complete, accurate, readily accessible, and systematically organized medical records." And it lacked "an adequate medical records system to ensure that inmates' records are correct and accessible so that physicians can provide appropriate care." The Jail suffered

from months-long backlogs of unfiled medical records. Patients requiring more sophisticated care were in an even worse position. The system in place failed to "facilitate … coordinated treatment by multiple providers because inmates' records [were] not accurate, organized or timely filed."

Finally, the Department of Justice investigation uncovered evidence that the Jail's grievance procedures were insufficient. Staff expressed frustration that the Jail health care professionals did not respond to medical and mental health grievances by inmates. Department of Justice investigators "reviewed numerous grievance files that alleged the need for medical services, some of an emergent nature, that showed a referral to [health care services], but contained no actual response to the grievance."

The Report concluded that the Jail needed to improve conditions by providing timely medical appointments, follow-up care, and complete, accurate, and systematically organized medical records. (The full Department of Justice Report is easily available at https://www.justice.gov/crt/about/spl/documents/CookCountyJail_findingsletter_7-11-08.pdf.)

Daniel also offered two related documents. The first was an Agreed Order entered in the federal lawsuit that arose from the Department of Justice investigation. The second was a 2010 report from the federal court monitor, Ronald Shansky, who reviewed the Jail's progress in meeting the terms of the Order.

The issue concerning the Department of Justice Report is whether it qualifies for the Federal Rule of Evidence 803(8)(A)(iii) hearsay exception in civil cases for "factual find-

ings from a legally authorized investigation" where the opponent does not show a lack of trustworthiness. The district court concluded that the Report lacked sufficient indicia of trustworthiness when examined under the committee comments to the Rule. The court also excluded the other two documents, declining to take judicial notice of the Agreed Order and rejecting Daniel's argument that the Shansky Monitor Report was a present sense impression under Rule 803(1).

We review the district court's exclusion of this evidence for abuse of discretion. *United States v. Rogers*, 587 F.3d 816, 819 (7th Cir. 2009). A district court abuses its discretion if it rules based on an erroneous view of the law or a clearly erroneous assessment of the evidence. *Costello v. BeavEx, Inc.*, 810 F.3d 1045, 1057 (7th Cir. 2016), quoting *Messner v. Northshore Univ. HealthSystem*, 669 F.3d 802, 811 (7th Cir. 2011); see also *Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384, 405 (1990). We review *de novo* the district court's legal interpretations for error, including its interpretation of the Federal Rules of Evidence. *Rogers*, 587 F.3d at 819. It is the nature of discretionary decisions that trial courts can reach conflicting decisions and that neither may be an abuse of discretion. In reviewing such decisions about the same piece of evidence in parallel lawsuits, though, we also exercise some supervisory responsibility to ensure that parties receive consistent treatment from court to court when identical evidence is at issue.

B. *The Official Investigation Exception*

Daniel offers the Report for the truth of its contents, relying on the hearsay exception in civil cases for "factual findings from a legally authorized investigation." Fed. R. Evid. 803(8)(A)(iii). These findings can take the form of an evaluative report containing both opinions and conclusions. *Jordan*

*v. Binns*, 712 F.3d 1123, 1132 (7th Cir. 2013). Mere transcripts of third-party statements do not constitute factual findings and still count as hearsay. *Id.* at 1133–34. A report that combines such statements with an investigator's on-scene observations and conclusions based on the sum of the evidence falls within the Rule 803(8) exception. *Id.* at 1134.

Such an evaluative report is presumed to be admissible in a civil case. *Id.* at 1132. A trial court has discretion to exclude the report if circumstances demonstrate a lack of trustworthiness. *Id.*, citing Fed. R. Evid. 803(8)(B). The burden to show untrustworthiness lies on the party seeking to exclude an evaluative report. *Id.* at 1134. We assume that public officials, in crafting such a report, acted "properly and without bias." *Id.* at 1132, citing Fed R. Evid. 803(8) advisory committee's note ("Justification for the exception is the assumption that a public official will perform his duty properly…."). That assumption can be rebutted, but it has not been rebutted here.

The Report meets the standard for admissibility. The Department of Justice conducted its investigation in accordance with its authority under the Civil Rights of Institutionalized Persons Act, 42 U.S.C. § 1997. It prepared the report based on extensive visits to the Jail, in collaboration "with consultants in the fields of use of force, corrections, correctional medical care, correctional mental health care, fire safety, and environmental health." The report contains third-party statements, including interviews with Jail staff, medical professionals, and inmates. But in conducting the investigation and coming to their findings, Department of Justice officials and experts combined these statements with extensive inspections and review of Jail documents, and their conclusions and recommendations took into account all available evidence.

In *Dixon v. County of Cook*, 819 F.3d 343, 348–49 (7th Cir. 2016), we reversed summary judgment for Cook County on a *Monell* claim based in large part on this same Department of Justice Report. The plaintiff was the estate of a Cook County Jail inmate who had died after, according to the plaintiff's evidence, unjustified delays and mix-ups in medical care for tumors and complications that eventually caused his death. *Id.* at 346–47. In finding that the plaintiff estate had met its burden of showing that Dixon's case was not just an isolated instance of errors, we relied on the same Report in dispute here. *Id.* at 349.

Judges of the Northern District of Illinois have confronted numerous *Monell* claims against Cook County based on poor health care in the Jail. Most judges have either held or signaled that the same Department of Justice Report would be admissible under Rule 803(8). See, e.g., *Martinez v. Cook County*, No. 11 C 1794, 2012 WL 6186601, at *4 n.7 (N.D. Ill. Dec. 12, 2012) ("courts have found Department of Justice letters of this exact type, when relevant, admissible under the Federal Rule of Evidence 803(8)"); *Hunt ex rel. Chiovari v. Dart*, 754 F. Supp. 2d 962, 970 n.5 (N.D. Ill. 2010) (collecting cases addressing admissibility of similar Department of Justice letters). Other courts have held analogous Department of Justice reports admissible under Rule 803(8). See, e.g., *Shepherd v. Dallas County*, 591 F.3d 445, 457–58 (5th Cir. 2009) (admitting similar 2006 Department of Justice report on investigation of health care at Dallas County Jail); *McLaughlin v. Freeman*, No. 2:08-CV-58-PRC, 2013 WL 5407046, at *4 (N.D. Ind. Sept. 26, 2013) (Department of Justice report criticizing jail conditions admissible under Rule 803(8)). In Daniel's case and one other we know of, the same Department of Justice Report has been excluded as hearsay outside the Rule 803(8) exception. See

*Bailey v. City of Chicago*, No. 08 C 4441, 2012 WL 850741, at \*5 (N.D. Ill. Mar. 9, 2012).

The district court in this case relied upon the 1972 advisory committee note to Rule 803(8) saying that the admissibility of evaluative reports was "controversial" and that courts should consider four factors as to whether to admit them. Fed. R. Evid. 803(8), cmt. (c). These factors include how timely the report is for the present litigation, the skill or expertise of the officer preparing the report, whether a hearing was held to evaluate the report, and whether the report suffered from any motivation problems. *Id.* The court determined that, in Daniel's case, the factors "militate against admission of the letter."

Committee notes to the Rules of Evidence are "entitled to our respectful consideration," *United States v. Dawson*, 434 F.3d 956, 958 (7th Cir. 2006), though they are by no means binding. *Deppe v. Tripp*, 863 F.2d 1356, 1362 (7th Cir. 1988). The test laid out by the committee note is not the law of this court, and the presumption of admissibility in the text of Rule 803(8) is not reversed by the note's contention that the hearsay exception was controversial in pre-Rule case law when it was adopted in 1972. The burden of persuasion still lies with the party seeking to exclude the investigative findings.

The factors enumerated in the committee note were not intended to be applied mechanically. The factors "may be of assistance" in close cases, and the list is by no means exhaustive. Fed. R. Evid. 803(8), cmt. (c) ("Others no doubt could be added."). The note pointed out that rote application of the factors "is an obvious impossibility," so courts are to "assume[] admissibility in the first instance" of evaluative reports. *Id.*

The relevant factors here weigh strongly in favor of admit-
ting the Department of Justice Report. The Report was timely
for this case. While the investigation was conducted in 2007,
the subsequent Agreed Order and Shansky Monitor Report,
both from 2010, show that the need for and process of correct-
ing the Jail's conditions continued into the months when Dan-
iel needed better and more timely medical care. In terms of
expertise, it is difficult to imagine an official investigation
with more expertise or facial credibility. The Department of
Justice relied on a team of experts in medicine, corrections,
and medical administration. There was no hearing, but the
Department provided a draft to Cook County officials and an
opportunity to respond.

Finally, we are not persuaded by the district court's con-
cern that the Department of Justice Report suffered from mo-
tivation problems because it was written in anticipation of lit-
igation. The Report was not prepared for purposes of litiga-
tion. It was prepared as part of an investigation that the De-
partment carried out pursuant to its duties under the Civil
Rights of Institutionalized Persons Act. Litigation could fol-
low, of course, depending on the outcome of the investigation
and the response of institutional officials to the findings. 42
U.S.C. § 1997. But litigation was not the point of the investiga-
tion or the Report. The mere fact that "the Attorney General
may initiate a lawsuit" against the Jail if a resolution is not
otherwise reached to address its unconstitutional conditions
does not mean that the preliminary investigation was con-
ducted as anticipatory fact-finding for a potential lawsuit. If
the law were otherwise, many official investigative findings
would be inadmissible.

In fact, the advisory committee note to Rule 803(8) listed a host of instances in which "[v]arious kinds of evaluative reports are admissible under federal statutes," many of which are cases where an agency's investigative report can become the factual basis for a subsequent lawsuit, and the advisory committee noted that such statutes provide a "helpful guide" for applying the more general hearsay exception in the rule. Fed. R. Evid. 803(8), cmt. (c). The defendants have not offered any particular evidence of a motivation problem other than the Department of Justice has the statutory authority both to investigate and then, if necessary, to litigate against the county. We start from the assumption that "public officials will perform their duties properly and without bias," *Jordan*, 712 F.3d at 1132, and we see no reason to believe this report suffers from motivation problems on the part of its authors. We do not mean to suggest that a target of such an investigation could never show a report is not sufficiently reliable to admit, but it would take a reason more powerful than any offered in this case.

There is a close fit between the factual and legal issues in a *Monell* claim based on a jail or prison's health care failings and this Report. As noted above, a plaintiff cannot ultimately prove a *Monell* claim at trial based on only his own case or even a handful of others. He must show systemic failings that reflect official deliberate indifference to the serious health needs of inmates. That is intended to be a demanding standard, and it is difficult, time-consuming, and expensive for most private plaintiffs to meet. Yet such systemic failings are exactly what the Department of Justice experts were looking for and found in Cook County. Compared to other forms of evidence of the overall quality of the jail's health care system,

the Department of Justice Report seems likely to deserve considerable weight.

The Report is not conclusive, of course. The defendants are entitled to a full opportunity to rebut it. But in litigating the constitutional adequacy of the Jail's health care, this Report would seem to provide a thorough and reasonably trustworthy starting point. It would be difficult to replicate through ordinary processes of litigating individual private cases. There may be individual circumstances that might justify exclusion of the Report, perhaps because it is no longer sufficiently timely or does not fit sufficiently well the issues in a particular case. But the general presumption of admissibility in the text of Rule 803(8) has considerable force.

C.  *Remaining Evidence Questions*

Daniel also asks this court to overturn the district court's decision not to admit the Agreed Order and the Shansky Monitor Report for the truth of the matters stated. He argues first that we may take judicial notice of the facts in the Agreed Order. The district court was correct to exclude the Order. Courts routinely take judicial notice of the actions of other courts or the contents of filings in other courts. See *General Electric Capital Corp. v. Lease Resolution Corp.*, 128 F.3d 1074, 1081 (7th Cir. 1997). Taking judicial notice of the contents of hearsay statements in such filings to prove the truth of the matters is much harder to justify. We may take judicial notice of findings of fact from another court proceeding only if, among other requirements, the fact is "not subject to reasonable dispute." *Id.* at 1082, quoting Fed. R. Evid. 201(b); see also *Hennessy v. Penril Datacomm Networks, Inc.*, 69 F.3d 1344, 1354 (7th Cir. 1995) ("In order for a fact to be judicially noticed, indisputability is a prerequisite."). Judicial notice is a powerful

tool that must be used with caution. *General Electric*, 128 F.3d at 1081.

The facts from the Agreed Order are in dispute for purposes of this case. Defendants in the 2010 litigation made clear that they did not "waive the right to contest the July 11, 2008 findings letter or any of the conclusions set forth therein." The facts in the Order were consented to "For the purposes of this lawsuit only." Finally, the Order makes clear that the Agreed Order itself would not be "admissible against Defendants except in a proceeding involving the parties to this Agreed Order." The district court did not err by declining to take judicial notice of facts asserted in the Agreed Order.

Daniel also argues that the monitor report prepared in 2010 by Dr. Shansky is admissible for the truth of its contents as a present sense impression under Federal Rule of Evidence 803(1). The Rule 803(1) hearsay exception covers statements that "describe an event or condition without calculated narration." *United States v. Boyce*, 742 F.3d 792, 797 (7th Cir. 2014). The statement must have been made contemporaneously with the speaker observing the events, or immediately thereafter. *Id.* The Shansky Monitor Report was a communication crafted with care for the court and parties based on scheduled visits to the Jail. There is no evidence that it was made at the time of Shansky's observations. The Monitor Report does not constitute a present sense impression and was properly excluded by the district court.

Accordingly, the Department of Justice Report should be admitted for the truth of its substance under Rule 803(8). The 2010 Agreed Order and Shansky Report are inadmissible hearsay to the extent they are offered to prove the truth of the statements they contain, but they may be admissible to show

that the defendants were on notice of their contents, or perhaps for other purposes.

*     *     *

We REVERSE the grant of summary judgment to the defendants and REMAND to the district court for further proceedings consistent with this opinion.