In the

# United States Court of Appeals

## For the Seventh Circuit

No. 16-1175

HERBERT DIGGS,

*Plaintiff-Appellant*,

*v.*

PARTHASARATHI GHOSH, et al.,

*Defendants-Appellees*.

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 14 C 3563 — **John W. Darrah**, *Judge*.

SUBMITTED FEBRUARY 21, 2017* — DECIDED MARCH 13, 2017

Before WOOD, *Chief Judge*, and POSNER and HAMILTON, *Circuit Judges*.

HAMILTON, *Circuit Judge*. In 2014, Herbert Diggs, an Illinois prisoner, sued three doctors and the former warden of Stateville Correctional Center, asserting principally that they were

---

* We have agreed to decide this case without oral argument because the briefs and record adequately present the facts and legal arguments, and oral argument would not significantly aid the court. See Fed. R. App. 34(a)(2)(C).

deliberately indifferent to a full tear in his right knee's anterior cruciate ligament ("ACL"). The tear had been diagnosed in 2009. When he filed suit in 2014 Diggs was (and for all we know he still is) waiting for surgery to repair the tear. The district court granted summary judgment for the defendants. We affirm in part and vacate and remand in part.

Because we are reviewing a grant of summary judgment, we consider facts that are undisputed, and where the evidence conflicts, we consider the version more favorable to plaintiff Diggs as the non-moving party. We also give him the benefit of reasonable inferences from the evidence. *White v. City of Chicago*, 829 F.3d 837, 841 (7th Cir. 2016). Diggs injured his knee in a fight with a cellmate in 2006, and for three years his ACL tear went undiagnosed. In the interim, he repeatedly complained to medical staff about knee pain, swelling, and instability (fourteen times he orally requested treatment from medical staff), for which they gave him pain medication.

In July 2009, Dr. Parthasarathi Ghosh, the prison's medical director, saw Diggs after he complained of right-knee instability. Dr. Ghosh recommended that Diggs be assigned to a lower bunk on a lower floor and ordered an MRI. The following month Dr. Ghosh referred Diggs to the University of Illinois-Chicago Medical Center ("UIC") for the MRI, which revealed that his right ACL had a complete tear. Dr. Ghosh then got approval from Wexford Health Sources, Inc. (the private company that contracts with Illinois to provide medical care to prisoners) for Diggs to receive orthopedic follow-up at UIC. Wexford's approval is required whenever an inmate needs outside medical care.

In October 2009, Diggs had his first of three visits with Dr. Alfonso Mejia, an orthopedist at UIC who is not a defendant

in this case. Diggs had a range of motion in his knee of zero to ninety degrees, which Dr. Mejia thought was too stiff for ACL surgery. Dr. Mejia explained that Diggs needed "to be made into a better preoperative candidate" before being evaluated for knee surgery. Dr. Mejia recommended ibuprofen, a crutch, "extensive aggressive physical therapy," and a follow-up appointment in four to six weeks. A month later, at Dr. Ghosh's request, Wexford pre-approved knee surgery for Diggs. From a constitutional standpoint, so far, so good.

But then, notwithstanding Dr. Mejia's recommendations, Diggs received no physical therapy and no medical follow-up. In February 2010, Diggs complained to Dr. Ghosh of continuing knee pain. Dr. Ghosh taught Diggs stretching exercises that he could perform in his cell, and he expanded Diggs's medical permit to include a crutch, a knee sleeve, and special boots. Dr. Ghosh did not understand why the pre-approved surgery had not taken place, so he obtained approval from Wexford to have Diggs follow up with Dr. Mejia regarding the reason for the delay.

At a visit in July 2010, Diggs told Dr. Mejia that he had not received any physical therapy for his knee in the past nine months, and Dr. Mejia noted that his range of motion had decreased slightly to ten to eighty degrees. Dr. Mejia recommended that Diggs receive physical therapy before being evaluated for surgery. Dr. Ghosh noted Mejia's recommendation and promptly referred Diggs to the physical therapist, an outside contractor who came to the prison twice weekly. According to the physical therapist's notes, Diggs steadily improved over the next two months and by October 2010 was "ready for surgery." Dr. Ghosh initially approved the physical therapist's recommendation for surgery, but he later decided

to wait and to reevaluate the situation depending on whether Diggs continued to complain about pain.

Another two years passed, during which Diggs had no follow-up. Dr. Ghosh renewed Diggs's medical permit in February 2011, but otherwise took no further action. Three months later, Dr. Imhotep Carter replaced Dr. Ghosh as the prison's medical director, and he did not examine Diggs for nearly a year. In the meantime, Diggs regularly complained about his knee pain to other medical staff. When Dr. Carter examined Diggs in March 2012, he learned of Diggs's knee injury, noted Diggs's use of a crutch, and renewed his medical permits. But Dr. Carter did not follow up on Diggs's knee, and he too left the prison two months later.

Roughly around this time, Diggs says, he repeatedly told the warden that his medical issues were being ignored. Marcus Hardy, Stateville's warden from December 2009 to December 2012, did not recall having any conversations with Diggs or seeing him use a crutch. Diggs, on the other hand, said that he told Warden Hardy on approximately five occasions that he was awaiting ACL surgery, and that Warden Hardy responded by telling him to bring the issue up with the medical department. Shortly after Dr. Carter's departure, Diggs filed an emergency grievance in which he requested surgery for his torn ACL and complained that his placement in a housing unit with stairs effectively confined him to his cell. Diggs says that Warden Hardy might have seen this grievance because the warden's office reviews all emergency grievances. The warden's office decided that his grievance was not an emergency and returned it to him four days later. Diggs then resubmitted it through the normal grievance process. Months later it was denied by the Administrative Review Board.

In the meantime Dr. Saleh Obaisi had taken over as medical director. He assessed Diggs's knee in September 2012. Dr. Obaisi obtained Wexford's approval to refer Diggs back to UIC for follow-up. In December 2012, Dr. Mejia again examined Diggs, who still complained about knee pain and instability, and the doctor noted that Diggs had completed physical therapy and now had a normal range of motion (zero to 125 degrees). Dr. Mejia, with Dr. Obaisi's approval, then referred Diggs to another orthopedist at UIC for a surgical evaluation.

In March 2013, Diggs saw Dr. Samuel Chmell, an orthopedist at UIC, who recommended (1) that Dr. Obaisi try to find a different hospital that had a physician who was willing to perform ACL reconstruction surgery on inmates (since the doctors at UIC would not) and (2) that Diggs receive more physical therapy for the time being. Dr. Obaisi, however, did not authorize any physical therapy. The next month Wexford approved Dr. Obaisi's decision to find a local orthopedist to perform the surgery.

Shortly after Wexford approved the search, Dr. Obaisi examined Diggs, noted mild swelling in his knee, and prescribed pain medication. He twice wrote in his treatment notes that he wanted to send Diggs back to UIC (even though they would not evaluate Diggs for surgery), but a visit was never scheduled. He examined Diggs again in February 2014 for knee pain and suggested to Wexford that they send Diggs back to UIC. This time, however, Wexford advised Dr. Obaisi to again try to find another orthopedic surgeon for Diggs instead, and they discussed treatment options over the next four months.

In June 2014, Dr. Obaisi finally authorized another round of physical therapy for Diggs. But in November, Diggs still complained of pain and had swelling and tenderness in his knee. On January 5, 2015, Dr. Ritz, a Wexford physician, reportedly told Dr. Obaisi that he should comply with UIC's recommendation of no surgery and stop presenting Diggs's case to Wexford because no local doctor would perform the surgery. (Dr. Ritz apparently misunderstood UIC's evaluation: the doctors there never disclaimed the need for surgery.)

Dr. Obaisi saw Diggs twice more in 2015. At appointments in May and June, Diggs reported that he had left-hip pain from overcompensating onto that leg, but a hip x-ray revealed no significant issues. Then in July, Dr. Obaisi referred Diggs to the Dreyer Medical Clinic, which had recently agreed with Wexford to treat Stateville inmates. In September Dr. Neena Szuch, an orthopedist at Dreyer, examined Diggs and found him "not an ideal candidate for ACL Reconstruction" because he performed only low-demand activities on a daily basis, had not complained of functional instability in his knee, and would not have access to daily physical therapy at the prison.

Diggs filed this civil-rights lawsuit in May 2014 and the district court early in the proceedings appointed counsel to represent him. Assisted by counsel, Diggs asserted that the doctors and Warden Hardy were deliberately indifferent toward his torn ACL and intentionally had caused him emotional distress. He also sought an injunction to compel Stateville's current warden to authorize ACL surgery.

The district court granted summary judgment for all defendants. Regarding Diggs's claims of deliberate indifference against the three prison doctors (Ghosh, Carter, and Obaisi), the court determined that the doctors' treatment choices—

which included "pain medication, some physical therapy, and various permits regarding physical activity to reduce strain on the knee"—were ones that other medical professionals would follow, especially because no doctor said that Diggs needed ACL surgery and Diggs's range of motion in his knee had improved considerably after physical therapy. As for Diggs's deliberate-indifference claim against Warden Hardy, the court concluded that Diggs did not provide facts showing that Hardy knew that the medical staff was supposedly mistreating him or not treating his ACL injury. Finally, regarding Diggs's claims of intentional infliction of emotional distress, the court granted summary judgment for all defendants because it determined that Diggs had not established that any of the defendants' conduct was extreme and outrageous.

On appeal Diggs, now proceeding pro se, first challenges the grant of summary judgment to the doctors on his deliberate-indifference claims. He maintains that the doctors delayed essential medical care and contravened the specialists' recommendations.

Deliberate indifference requires that a defendant "knows of and disregards an excessive risk to inmate health or safety." *Farmer v. Brennan*, 511 U.S. 825, 837 (1994). Whether a prison official or doctor was subjectively aware of a risk "is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence, and a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious." *Id.* at 842 (citation omitted). Although a difference of opinion among doctors is not enough to establish deliberate indifference, see, e.g., *Petties v. Carter*, 836 F.3d 722, 729 (7th Cir. 2016) (en banc), an inmate need not show that he was "literally ignored" to

prevail on a deliberate-indifference claim. *Conley v. Birch*, 796 F.3d 742, 748 (7th Cir. 2015) (citation omitted). "And if the defendant's chosen 'course of treatment' departs radically from 'accepted professional practice,' a jury may infer from the treatment decision itself that no exercise of professional judgment actually occurred." *Zaya v. Sood*, 836 F.3d 800, 805 (7th Cir. 2016).

With these standards in mind, we ask whether Diggs has put forward enough evidence to survive summary judgment with regard to the three doctors—Ghosh, Carter, and Obaisi—whom the district court addressed together in its analysis. The district court concluded that Diggs's evidence was not sufficient: "The undisputed facts do not show that no minimally competent professional would have treated Plaintiff's injury in the manner of Defendants." The record, observed the court, did not show that any doctor recommended ACL surgery, and it was "undisputed that Defendants did provide treatment options such as pain medication, some physical therapy, and various permits regarding physical activity to reduce strain on the knee."

We begin with Dr. Ghosh, who—during the early stages of Diggs's treatment—repeatedly delayed medical care despite a specialist's recommendation to the contrary. The district court overlooked key evidence that would allow a jury to find that he knew of a substantial risk of serious harm and did nothing to protect Diggs. The court relied upon evidence that Dr. Ghosh gave Diggs pain medication, a medical permit, and a round of physical therapy that helped improve his range of motion. The court did not discuss, however, evidence that Dr. Ghosh twice disregarded the advice of the UIC specialist, Dr. Mejia. Dr. Ghosh first ignored Dr. Mejia's advice to give

Diggs "extensive aggressive physical therapy"; for the next four months, Diggs received no treatment at all, and, at Diggs's next follow-up, Dr. Mejia noted that Diggs's range of motion had deteriorated. After that follow-up, Dr. Ghosh again deviated from the treatment recommended by the specialist. He gave Diggs physical therapy but disregarded Dr. Mejia's recommendation that another follow-up be scheduled for a surgical evaluation. Dr. Ghosh then decided to monitor Diggs's knee condition himself and took no further action. The district court said nothing about these questionable decisions, which resulted in treatment being unnecessarily delayed.

Similarly, the district court glossed over key details concerning Dr. Carter, who never followed up on Diggs's knee injury at any point during his nine-month stint at Stateville (from July 2011 to May 2012). It is true, as Dr. Carter asserts, that he saw Diggs only once during his brief time working at the prison (and that was in regard to a heart issue). But the court did not address evidence that Dr. Carter knew of Diggs's knee problems and did nothing. The court noted selective details about Dr. Carter—that he had reviewed all of Diggs's medical records before the appointment, observed Diggs's use of a crutch, and renewed Diggs's existing medical permit. The court did not mention that Diggs testified at his deposition that he *told* Dr. Carter at that March 2012 visit that he was in pain and had been approved for ACL surgery or that the medical records reviewed by Dr. Carter contained numerous complaints he had recently made about knee pain and a prior authorization from Wexford for surgery. These unacknowledged facts are noteworthy because a jury could infer from them that Dr. Carter "knowingly disregarded" Diggs's ACL

tear by not recommending *any* treatment for him. *Conley*, 796 F.3d at 747.

The district court also overlooked evidence that Dr. Obaisi did not base his treatment decisions on medical judgment. The court acknowledged that "[o]nce a physician willing to perform the surgery was found, Dr. Obaisi submitted a request for a referral" for an orthopedic follow-up, but the court did not mention Dr. Obaisi's decisions to do nothing about Diggs's care. For over a year, Dr. Obaisi ignored Dr. Chmell's advice to give Diggs more physical therapy, despite Diggs's continued complaints of pain. Additionally, Dr. Obaisi largely ignored Dr. Chmell's other recommendation that he find a local surgeon to evaluate Diggs. After his initial search of unknown scope), he wanted to send Diggs back to UIC so that they could make other recommendations, but he never did. Then when Dr. Ritz, a Wexford physician, told Dr. Obaisi to stop presenting Diggs's case because Dr. Ritz mistakenly thought that the UIC doctors recommended *no* ACL surgery, Dr. Obaisi complied without question. Finally, for nine months, Dr. Obaisi took no action to obtain a surgical evaluation until Wexford found an orthopedist without his assistance. In evaluating Dr. Obaisi's decisions, the district court did not address any of this evidence.

Diggs also argues that the district court improperly granted summary judgment to Warden Hardy. In the court's view, Diggs had not "provided facts showing that Warden Hardy had any knowledge that [he] was not being treated for his injury or was being mistreated by medical staff." Diggs, the court said, offered nothing to show that he informed War-

den Hardy of his mistreatment, other than invoking conversations in which he told Warden Hardy that he was awaiting surgery.

The district court erred in concluding that Diggs did not present enough evidence to show that Warden Hardy knew that the medical staff was mistreating him. The court disregarded Diggs's own sworn testimony that four or five times over three years he told Warden Hardy that he was waiting on surgery and had a painful knee injury. This testimony was sufficient to show that Warden Hardy had knowledge of Diggs's predicament. It is undisputed that Warden Hardy took no action to investigate Diggs's complaints, other than to tell Diggs to raise them with the medical staff. As a layperson, the warden could rely on the medical staff's expertise as long as he did not ignore Diggs or his mistreatment. See *Arnett v. Webster*, 658 F.3d 742, 755 (7th Cir. 2011); *Berry v. Peterman*, 604 F.3d 435, 440 (7th Cir. 2010). But Warden Hardy took no action in response to Diggs's repeated complaints about his knee. Compare *Perez v. Fenoglio*, 792 F.3d 768, 782 (7th Cir. 2015) (plaintiff stated deliberate-indifference claim against grievance officials where they did not intervene after receiving several grievances regarding plaintiff's medical care), with *Berry*, 604 F.3d at 440 (plaintiff did not present sufficient facts from which a reasonable jury could infer that jail administrator was deliberately indifferent where he consulted with medical staff and responded to plaintiff's complaints).

Diggs's claims for intentional infliction of emotional distress fail, however, because he has not presented sufficient facts from which a jury could infer that the defendants' conduct was extreme and outrageous. *See Dixon v. County of Cook*, 819 F.3d 343, 351 (7th Cir. 2016) (applying Illinois law). As the

district court explained, the doctors' and Hardy's actions "did not go beyond all bounds of decency so as to be considered intolerable in a civilized community." Warden Hardy responded during his daily rounds to Diggs's complaints. Drs. Ghosh and Obaisi provided some treatment over their tenures as medical director and did not threaten or harass Diggs. And Dr. Carter renewed a medical permit for Diggs's knee. Simply put, the circumstances would not cause a reasonable person to think that any defendant's conduct was outrageous.

Finally, Diggs vigorously asserts that his recruited counsel in the district court rendered ineffective assistance by, among other things, not properly contesting the defendants' statements of material facts. There is, however, no Sixth Amendment right to effective assistance of counsel in civil cases. *See Pendell v. City of Peoria*, 799 F.3d 916, 918 (7th Cir. 2015); *Stanciel v. Gramley*, 267 F.3d 575, 581 (7th Cir. 2001). We add, though, that notwithstanding the absence of such a constitutional right, pro se litigants' requests for counsel are entitled to careful consideration, *Pruitt v. Mote*, 503 F.3d 647, 661 (7th Cir. 2007) (en banc), as the district court gave here.

Because a reasonable jury could find for Diggs on his deliberate-indifference claims against Warden Hardy and Doctors Ghosh, Carter, and Obaisi, we VACATE the grant of summary judgment on these claims and REMAND for further proceedings. We AFFIRM the judgment in all other respects.