In the

# United States Court of Appeals
## For the Seventh Circuit

No. 18-2660

SCOTT HILDRETH,

*Plaintiff-Appellant,*

*v.*

KIM BUTLER, LORI OAKLEY, and
WEXFORD HEALTH SOURCES, INC.,

*Defendants-Appellees.*

Appeal from the United States District Court for the
Southern District of Illinois.
No. 3:15-cv-00831-NJR-DGW — **Nancy J. Rosenstengel**, *Chief Judge.*

ARGUED SEPTEMBER 19, 2019 — DECIDED MAY 19, 2020

Before SYKES, HAMILTON, and BRENNAN, *Circuit Judges.*

BRENNAN, *Circuit Judge.* Scott Hildreth, an inmate at an Illinois maximum-security prison, suffers from Parkinson's disease. He takes a prescription medication distributed by the prison three times a day to manage his symptoms. On three occasions Hildreth received his medication refill a few days late, causing him to experience withdrawal symptoms. His symptoms also render his handwriting illegible, so Hildreth

uses a typewriter to draft documents. He requested to keep that typewriter in his cell, which the prison denied because it was considered contraband. Instead, the prison provided Hildreth with an assistant to help him draft documents and increased access to the library where he can use a typewriter.

Feeling his treatment was lacking, Hildreth sued Wexford Health Sources, Inc. and two jail administrators under 42 U.S.C. § 1983 and the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12101 *et seq.*, alleging they violated his constitutional and statutory rights. The district court granted summary judgment to the defendants. Because Hildreth has not shown medication delays were a widespread practice or custom at the prison, and he received reasonable accommodations for his Parkinson's disease, we affirm the district court's decision.

## I. Background

### A. Delays in Hildreth's Medication

Hildreth's Parkinson's disease causes him to lose his balance, move uncontrollably, and occasionally fall. To alleviate these symptoms, a prison doctor prescribed Mirapex, which Hildreth contends made a "day and night" difference. As a specialty prescription, Mirapex was not kept in stock at the prison; instead, it was filled by an outside pharmacy. The prison allows Hildreth to keep a monthly supply of 90 Mirapex pills in his cell.

To refill his prescription, Hildreth must submit a refill sticker within seven days of the end of the prescription to a nurse, who takes it to an outside pharmacy. Hildreth usually receives his refill when he has three to five days of medication left.

According to Hildreth, his prescription refill was delayed "at least three times," causing him to experience withdrawal symptoms within a day or two. In each instance, he informed his gallery officer, who instructed him to tell the nurse. The nurse often told him to wait and see if the prescription would arrive on time. When his medication was late, Hildreth would file a grievance. For two of the three grievances, Hildreth received his medication within a few days of his prescription lapsing. Wexford's medical director, Dr. Roderick Matticks, testified the third lapse occurred in part because Hildreth failed to attend the chronic clinic, where a Wexford physician evaluates chronically ill inmates to assess their condition and whether prescriptions should be continued. Dr. Matticks was aware of these two or three instances in which Hildreth "had some perceived delays in obtaining refills on his medications."

## B. Hildreth's Request for a Typewriter

Hildreth used a typewriter instead of handwriting documents because his Parkinson's symptoms rendered them illegible. But the prison, a maximum-security facility, banned the typewriter from his cell as contraband. Hildreth also claimed the prison discriminated against him based on his Parkinson's disease by failing to reasonably accommodate him for his inability to write legibly.

To accommodate Hildreth's request to draft documents, he was placed on the automatic call line to the law library when he was 90 days away from a court deadline. A counselor was available to help him draft documents, and he could contact an officer for emergencies. Hildreth also could use a typewriter whenever he had access to the law library. Kim Butler, the former assistant warden and ADA coordinator, granted

Hildreth access to the law library three days per week from 8:00 a.m. to 2:00 p.m. to use the typewriter.

In the summer of 2012, Hildreth filed a grievance requesting a permit allowing him to possess the typewriter in his cell. Over two years later, on October 30, 2014, Hildreth filed a grievance stating he needed staff assistance to file grievances. Defendant Lori Oakley, a grievance officer, reviewed the complaint and found it moot because Butler had provided Hildreth with increased law library access and assistance to draft grievances. Hildreth's extra library access was later rescinded after he was provided an ADA attendant to help write grievances and pleadings. According to Hildreth, the ADA attendant did not have a high school degree, could not spell, and had sloppy handwriting. Hildreth concluded it was "not even worth it" to use the attendant. The current ADA coordinator, Angela Crain, noted if Hildreth did not want the attendant, "he can simply request extra library time again in lieu of the attendant and the ADA attendant will then be assigned to another inmate."

Hildreth has not missed any court deadlines due to the prison's actions. Still, he testified he can do only a portion of what he used to, which was to spend at least six hours a day working on court filings with a typewriter in his cell. While other inmates can draft handwritten court filings at any time in their cells, Hildreth is limited to his time with the typewriter in the library.

### C. District Court Proceedings

Hildreth sued under 42 U.S.C. § 1983 alleging Wexford violated his Eighth Amendment right by intentionally not refilling his Parkinson's medication on time, and under the ADA

that defendants Butler and Oakley discriminated against him by denying him access to a typewriter in his cell. Hildreth sought damages for past harm as well as prospective injunctive relief. While Hildreth initially sued pro se, the district court appointed counsel for him. Through that counsel Hildreth filed an amended complaint and engaged in discovery, including deposing Wexford's Rule 30(b)(6) designee.[1]

Wexford moved for summary judgment on Hildreth's § 1983 claim. According to Wexford, Hildreth's medication was late only three times over a period of nineteen months, too infrequent from which to infer a widespread practice or custom of deliberate indifference. The district court agreed and found only three documented instances when Hildreth experienced medication delays over a period of nineteen months:

- On April 8, 2014, Hildreth submitted a grievance noting he was out of medication. The Warden determined this was an emergency. A doctor saw Hildreth the next day and renewed his medication for

---

[1] Our dissenting colleague in Section I of his opinion sends out a warning "of obvious implications for discovery in the district courts" in future cases. That section of the dissent references reports and other materials which, the dissenting opinion admits, are outside of this case's record. Neither the result of this case nor this majority opinion's reasoning opens any doors to future similar litigation or expands the discovery in which parties may engage. The scope of discovery is defined by the claims pursued and the defenses raised. For the plaintiff's part, he set those parameters with the help of counsel. This majority opinion does not address discovery because it was not an issue in this appeal.

one year, but Hildreth did not receive his medica-
tion until a later date. The record does not indicate
when he received this prescription.

- On October 25, 2014, Hildreth submitted another
grievance stating he was about to run out of his pre-
scription and had a couple days' worth left. The
warden expedited this as an emergency. The griev-
ance officer then contacted the healthcare unit,
which stated Hildreth received the medication on
October 30, 2014.

- On November 16, 2015, Hildreth submitted a griev-
ance stating he had been out of his medication since
November 13. The Warden expedited this griev-
ance. The healthcare unit administrator advised the
grievance officer that Hildreth's prescription had
expired and the request to continue using Mirapex
was sent to the pharmacy. The grievance officer re-
sponded on November 23, 2015, finding this griev-
ance moot. The record does not indicate when he
received this prescription.

Hildreth did not present evidence that any other inmates
experienced medication delays.[2] The district court found that
three delays over the period of a year and a half involving
only Hildreth did not support an inference of a widespread

---

[2] Hildreth's other grievances did not relate to medication refill delays
or were inadmissible hearsay. For example, Hildreth's October 30, 2014
grievance complained about the need for assistance in writing grievances,
not about refill delays. And Hildreth's January 15, 2016 grievance referred
to the return of his November 16, 2015 grievance—again, not about refill
delays.

practice or custom, so summary judgment was granted to Wexford.

Defendants Butler and Oakley also moved for summary judgment on Hildreth's ADA claim, arguing they reasonably accommodated his disability. The district court considered whether Hildreth, given his disability, was able to participate in the activities in question with or without reasonable accommodations. The district court found he was able to use the law library and access a typewriter three times per week for six hours a day from August 2013 to July 2015. He also could contact an officer in emergency situations, and a counselor was available to assist. The increased library access was rescinded only after Hildreth was assigned a personal ADA attendant. Nevertheless, Hildreth could have requested extra library time in lieu of using the attendant. Although Hildreth complained the attendant was inadequate, Hildreth did not miss any court deadlines.

Considering the prison's security concerns and the fact that Hildreth was able to successfully draft documents, the district court found the prison's accommodations reasonable as a matter of law and granted summary judgment to Butler and Oakley on this claim. Hildreth appealed.

## II. Discussion

Summary judgment is proper when the admissible evidence shows no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. *See* FED. R. CIV. P. 56; *Barnes v. City of Centralia*, 943 F.3d 826, 830 (7th Cir. 2019). We review de novo the district court's

grant of summary judgment and construe all facts and reasonable inferences in Hildreth's favor. *See Barnes*, 943 F.3d at 828.

## A.  Section 1983 Claim

We start with Hildreth's Eighth Amendment claim against Wexford, which he brought under § 1983's policy-or-custom framework of *Monell v. NYC Soc. Serv.*, 436 U.S. 658 (1978).[3] Deliberate indifference to a prisoner's serious medical needs may constitute cruel and unusual punishment under the Eighth Amendment. *Campbell v. Kallas*, 936 F.3d 536, 544–45 (7th Cir. 2019) (citing *Estelle v. Gamble*, 429 U.S. 97, 103 (1976)). To prevail on such a claim, a plaintiff must show his condition was objectively, sufficiently serious and that the prison officials manifested deliberate indifference to his serious medical needs. *Id.* at 545. To be sure, negligence, gross negligence, or even recklessness as the term is used in tort cases is not enough—the prison officials' state of mind must rise to the level of deliberate indifference. *Burton v. Downey*, 805 F.3d 776, 785 (7th Cir. 2015) (holding alleged two-day delay

---

[3] In the alternative, Hildreth asks this court to apply a *respondeat superior* theory of liability to private corporations, like Wexford. This argument is new on appeal and thus forfeited. *See Hahn v. Walsh*, 762 F.3d 617, 639 (7th Cir. 2014) (holding "plaintiffs have waived the issue of [a private company's] respondeat superior liability [under § 1983] because they failed to raise it before the district court"). While courts, including ours, have at times used the terms waiver and forfeiture interchangeably, this court recently clarified that forfeiture occurs where, as here, a party inadvertently fails to raise an argument in the district court. *United States v. Flores*, 929 F.3d 443, 447 (7th Cir. 2019) ("Waiver occurs when a party intentionally relinquishes a known right and forfeiture arises when a party inadvertently fails to raise an argument in the district court.").

providing medication to detainee was not deliberate indifference).

Because Wexford is a "private corporation that has contracted to provide essential government services [it] is subject [under § 1983] to at least the same rules that apply to public entities." *Glisson v. Ind. Dep't of Corr.*, 849 F.3d 372, 378–79 (7th Cir. 2017) (en banc). Hildreth does not point to an official unconstitutional policy; instead, he claims Wexford has a custom of delaying prescriptions.[4]

To support a § 1983 claim on this theory, Hildreth must show: (1) defendants' practice in refilling prescriptions violated his constitutional rights; and (2) that practice was "so pervasive that acquiescence on the part of policymakers was apparent and amounted to a policy decision." *Phelan v. Cook Cty.*, 463 F.3d 773, 789, 790 (7th Cir. 2006). This requires "more than a showing of one or two missteps." *Id.* There must be "systemic and gross deficiencies." *Id.* Even if such deficiencies exist, Hildreth must show policymakers knew of the deficiencies and failed to correct them, manifesting deliberate indifference. *Id.*

We put the first requirement to the side because Hildreth has not provided enough evidence on the second to show a practice of delaying prescriptions was widespread, which is

---

[4] Our dissenting colleague labels Hildreth's allegations a "policy" claim, although the dissent admits Hildreth uses the term "custom" in his briefing, and Hildreth states "[a] corporate 'custom' is at issue here." Appellant's Br. at 31.

the "pivotal requirement" of his § 1983 claim.[5] *Grieveson v. Anderson*, 538 F.3d 763, 774 (7th Cir. 2008) (holding 4 incidents over about 11 months involving only plaintiff was insufficient to show a widespread practice or custom).

Hildreth's claim fails on two axes: first, his allegations of delays are insufficiently widespread, as they involve only him; and second, the alleged delays are insufficiently numerous, as he has substantiated only three.

### 1. *Incidents involving only Hildreth*

Hildreth provides evidence of delays in only his personal prescriptions. While it is not "impossible" for a plaintiff to demonstrate a widespread practice or custom with evidence limited to personal experience, "it is necessarily more difficult … because 'what is needed is evidence that there is a true municipal policy at issue, not a random event.'" *Id.* (quoting *Calhoun v. Ramsey*, 408 F.3d 375, 380 (7th Cir. 2005)); *see Winkler v. Madison Cty.*, 893 F.3d 877, 902 (6th Cir. 2018) (affirming summary judgment in county's favor when plaintiff "discusses only [her son's] treatment, and therefore cannot establish that the County had a custom of deliberate indifference to the serious healthcare needs of all the inmates"); *Denham v. Corizon Health, Inc.*, 675 F. App'x 935, 944 (11th Cir. 2017) (holding plaintiff failed to show a custom of providing inadequate medical care when plaintiff's claims rest only on one inmate's experiences); *Payne v. Servier Cty.*, 681 F. App'x 443, 446–47 (6th Cir. 2017) (holding "five instances of alleged

---

[5] Because there was not enough evidence of a custom, we also need not address whether Wexford acted with deliberate indifference. *See Grieveson v. Anderson*, 538 F.3d 763, 774 (7th Cir. 2008).

misconduct, over three months, all involving the plaintiff himself is not enough to prove a custom"); *Culbertson v. Lykos*, 790 F.3d 608, 629 (5th Cir. 2015) (holding allegations "limited to the events surrounding the plaintiffs" are insufficient to establish a widespread practice or custom). This is not a case where the incidents are so numerous to satisfy the "more difficult" task of proving a custom with only evidence of personal experience. *Grieveson*, 538 F.3d at 774.

### 2. *Insufficient Number of Delays*

Hildreth alleges his prescription lapsed "at least three times." And the district court found three grievances for Hildreth's lapsed medication on April 8, 2014, October 25, 2014, and November 16, 2015. Other than these three personal experiences, Hildreth has not provided evidence that any other inmates experienced prescription delays.

Three instances of prescription delays over nineteen months involving solely one inmate fail to qualify as a widespread unconstitutional practice so well-settled that it constitutes a custom or usage with the force of law. Although this court has not adopted any "bright-line rules" defining a widespread practice or custom, we have acknowledged that the frequency of conduct necessary to impose *Monell* liability must be more than three. *Thomas v. Cook Cty. Sheriff's Dep't*, 604 F.3d 293, 303 (7th Cir. 2010) (noting "there is no clear consensus as to how frequently such conduct must occur to impose *Monell* liability, 'except that it must be more than one instance,' or even three") (citations omitted); *see also, e.g., Doe v. Vigo Cty.*, 905 F.3d 1038, 1045 (7th Cir. 2018) (holding a "handful of incidents of misconduct," including three incidents of sexual contact, two incidents of inappropriate comments, and two allegations of harassment over two decades

"is not enough to establish a custom or practice"); *Estate of Moreland v. Dieter*, 395 F.3d 747, 760 (7th Cir. 2005) (holding three incidents of improper pepper-spraying over a three-year period did not amount to a widespread custom); *Gable v. City of Chicago*, 296 F.3d 531, 538 (7th Cir. 2002) (holding three incidents of erroneously denying to vehicle owners that their vehicles were in the impoundment lot over a four-year period did not amount to a persistent and widespread practice).

We agree with the district court that this case is comparable to *Grieveson v. Anderson*, 538 F.3d 763 (7th Cir. 2008). In *Grieveson*, on four occasions over a period of about eleven months, jail guards gave the plaintiff his entire prescription at once, exposing him to the risk of theft by other inmates. Those four instances were insufficient to establish a widespread practice or custom. 538 F.3d at 774. As *Grieveson* explained, "evidence of four incidents that [plaintiff] alone experienced" is "simply not enough to foster a genuine issue of material fact that the practice was widespread." *Id.* at 774–75. Accordingly, granting summary judgment in Wexford's favor was proper.

Our dissenting colleague attempts to distinguish *Grieveson*. Grieveson complained once, while Hildreth complained three times, and Grieveson did not allege widespread non-compliance with official policy. But a single complaint of four incidents over eleven months is not materially different than three complaints, each of a single incident, over nineteen months. And like Grieveson, Hildreth did not allege a widespread failure. Hildreth's allegations concern only himself. He sued on his own behalf and not for others. Indeed, the term "widespread" is absent from Hildreth's amended complaint, which was filed with the assistance of counsel.

Our reasoning and conclusion here agree with other circuits that have considered the frequency of instances to establish a widespread practice or custom. Those cases have concluded that four or more incidents over varying periods—sometimes less than nineteen months—are insufficient to qualify as a widespread practice or custom.[6]

---

[6] Evidence of four incidents fell "far short" of proving a widespread practice or custom. *See Jones v. Town of E. Haven*, 691 F.3d 72, 85 (2d Cir. 2012) (holding four incidents over approximately four years "fell far short" of showing a custom); *Giaccio v. City of New York*, 308 F. App'x 470, 472 (2d Cir. 2009) (holding "only four examples" of misconduct fell "far short" of establishing a widespread practice).

Evidence of five incidents involving only the plaintiff was not enough to prove a widespread practice or custom, even when those incidents occurred in a short three-month period. *See Payne v. Servier Cty.*, 681 F. App'x 443, 446–47 (6th Cir. 2017) (holding "five instances of alleged misconduct, over three months, all involving the plaintiff himself is not enough to prove a custom" and that "plaintiff cannot establish a custom solely by pointing to the facts of his own case").

Evidence of more than five incidents was insufficient to prove a widespread practice or custom over a variety of time frames. *See, e.g., Ruiz-Bueno v. Scott*, 639 F. App'x 354, 364 (6th Cir. 2016) (holding 10 incidents in the past 18 years did not demonstrate pattern of constitutional violations); *Peterson v. City of Fort Worth*, 588 F.3d 838, 851 (5th Cir. 2009) (holding 27 complaints of excessive force over 3 years were insufficient to establish a pattern); *Pineda v. City of Houston*, 291 F.3d 325, 329 (5th Cir. 2002) (holding 11 incidents of warrantless entry did not support an unconstitutional pattern), 124 F. Supp. 2d 1057, 1070 (S.D. Tex. 2000) (illustrating a four-year period for the incidents of warrantless entry); *Mettler v. Whitledge*, 165 F.3d 1197, 1204–05 (8th Cir. 1999) (holding 16 incidents ranging between August 1982 and January 1994 were insufficient to prove a custom); *Silva v. Worden*, 130 F.3d 26, 32 (1st Cir. 1997) (finding insufficient evidence of a custom when witnesses "could only remember a few instances over the last twenty years"); *Carter v. District of Columbia*, 795 F.2d 116, 123 (D.C. Cir. 1986) (holding six prior incidents of alleged

### 3. *Other Alleged Incidents*

Hildreth cites other incidents which he says qualify as part of a widespread practice or custom. But due to failures of proof and forfeiture, those incidents cannot be considered. Hildreth argues the district court erred in excluding evidence of two more delays in prescription refills discussed in another inmate's affidavit. Michael McGowan attested he overheard conversations between Hildreth and people whom McGowan believed to be Wexford nurses. The affidavit describes an October 2015 incident, when a nurse refused to accept Hildreth's medication refill slip because of Hildreth's demeanor. The affidavit also describes an undated incident, when a nurse said she was not going to "check on the status" of Hildreth's medication and that he needed to wait for it to arrive.

Hildreth submitted McGowan's affidavit in response to Wexford's motion for summary judgment. The district court excluded the affidavit as inadmissible hearsay. We review a district court's evidentiary decision for an abuse of discretion. *See Bordelon v. Bd. of Educ. of the City of Chi.*, 811 F.3d 984, 991 (7th Cir. 2016). Hildreth argues the district court abused its discretion by excluding this affidavit because the statements in McGowan's affidavits were made by an agent of a party

---

misconduct over approximately two years did not establish pattern of excessive force); *cf. Bordanaro v. McLeod*, 871 F.2d 1151, 1156 (1st Cir. 1989) (finding a widespread practice or custom when doors were broken down by officers without a warrant with a sledge hammer provided by the city and the sergeant was present at "about 20 or 30" or "50, 60" instances over his 24-year tenure as a police officer).

opponent under Federal Rule of Evidence 801(d)(2)(D) and are not hearsay.

We conclude the district court did not abuse its discretion by not considering the McGowan affidavit because there was insufficient evidence to establish that Wexford employed the nurses referenced in the affidavit. Hildreth failed to show that the nurses who allegedly made these statements were employed by Wexford, and he failed to confirm that the statements were made within the scope of employment. *Id.* at 992. Even if a Wexford nurse did make these comments, "not everything that relates to one's job falls within the scope of one's agency or employment." *Williams v. Pharmacia, Inc.*, 137 F.3d 944, 950 (7th Cir. 1998). While the "precise reach of Rule 801(d)(2)(D) is sometimes difficult to discern," the inquiry is easy where, as here, the affidavit does not establish an employment relationship and does not establish the statements were made within the scope of such relationship. *Id.*

Even if the district court had abused its discretion and improperly excluded these two other incidents, Hildreth's claim still fails because the "practice" of medication delay was not widespread. Importantly, neither of these incidents describe a delay in the delivery of Hildreth's prescription. The first relates to a nurse refusing to accept the medication refill slip due to Hildreth's demeanor—not an allegation concerning a medication delay. The second undated incident refers to a nurse saying she would not "check on the status" of Hildreth's medication—again, not a medication delay. Without knowing when the prescription was due to be delivered, a delay cannot be presumed. So neither of these incidents can support Hildreth's claim that Wexford has an unconstitutional practice or custom of delaying prescriptions.

On appeal, Hildreth employs a kitchen-sink strategy by arguing there were three more delays (beyond the five discussed so far) for a total of eight delays that the district court failed to consider. These three further instances were not argued in the district court, so we cannot consider them. *See, e.g., Scheidler v. Indiana*, 914 F.3d 535, 540, 544 (7th Cir. 2019) (holding plaintiff forfeited her argument by not developing it in the district court); *Flournoy v. Schomig*, 418 F. App'x 528, 531 (7th Cir. 2011) (refusing to consider new evidence of deliberate indifference under § 1983 when plaintiff did not raise the issue before the district court); *see also United States v. Flores*, 929 F.3d 443, 447 (7th Cir. 2019) (explaining forfeiture arises when a party inadvertently fails to raise an argument in the district court).

Even if we were to review these three additional allegations on appeal, they are vague, they lack sufficient connection to Wexford, and at least two occurred sporadically several years before the other alleged incidents. Specifically, two incidents are dated November 3, 2009 and January 28, 2011 and were included in the "cumulative counseling summary" to Hildreth's summary judgment response on the issue of exhaustion of administrative remedies. Hildreth failed to discuss any of these incidents in his summary judgment response on the issue of inadequate care, the issue under consideration. The third incident is an undated occurrence when his medication lapsed because it was not renewed, which was also not discussed in his summary judgment response on the issue of inadequate care. The district court did not err in not considering them, as it is not the court's job to "scour the record in search of evidence to defeat a motion for summary judgment." *Harney v. Speedway SuperAmerica, LLC*, 526 F.3d 1099, 1104 (7th Cir. 2008).

Even if the hearsay, forfeiture, and relevance rules were put to the side, and we considered all eight incidents which occurred over a period of six years, courts have concluded that more than eight incidents over a shorter time period does not constitute a "widespread" practice or custom. *See, e.g.*, *Pittman ex rel Hamilton v. Cty. of Madison*, 746 F.3d 766, 780 (7th Cir. 2014) (holding 36 suicide attempts and 3 suicides in a 5-year period was not enough evidence of a widespread inadequate suicide policy); *Peterson v. City of Fort Worth*, 588 F.3d 838, 851 (5th Cir. 2009) (holding 27 complaints of excessive force over 3 years were insufficient to establish a pattern); *Pineda v. City of Houston*, 291 F.3d 325, 329 (5th Cir. 2002) (holding 11 incidents of warrantless entry over a 4-year period did not support an unconstitutional pattern).

The dissent states we adopt a "bright-line rule" as to the number of incidents to establish an unconstitutional custom under *Monell*.[7] But rather than set a number, we have considered and applied the precedents of this and other courts to

---

[7] The dissent asserts this opinion "is at odds with our approach to *Monell*, which focuses broadly on indicia of municipal or corporate responsibility rather than just the number of incidents." For this proposition the dissent cites *Dixon v. County of Cook*, 819 F.3d 343 (7th Cir. 2016), and *Daniel v. Cook County*, 833 F.3d 728 (7th Cir. 2016), but neither case is availing here. *Dixon* included an institutional claim—the implementation of a medical records policy—from which the dissent's quote emanates. 819 F.3d at 348–49. In contrast, Hildreth brought an individual claim. And the claim in *Daniel* concerned whether Cook County Jail's scheduling and record keeping resulted in medical care falling below constitutional standards as a matter of official policy, custom, or practice. 833 F.3d at 734. As *Daniel* stated, "[t]o prove an official policy, custom, or practice within the meaning of *Monell*, Daniel must show more than the deficiencies specific to his own experience, of course." 833 F.3d at 734. Again, Hildreth's claim is limited to his own experience.

these facts, nothing less and nothing more. Hildreth has not shown five incidents of prescription refill delay, much less eight. And under that law three delays over nineteen months for a single individual does not establish a widespread custom or practice of delaying medication. So we affirm the district court's grant of summary judgment to Wexford on Hildreth's § 1983 claim.

### B. ADA Claim

We turn next to Hildreth's statutory claim under the ADA.[8] Under the Act, "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. To establish a violation, a plaintiff must show "he is a qualified individual with a disability, that he was denied the benefits of the services, programs, or activities of a public entity or otherwise subjected to discrimination by such an entity, and that the denial or discrimination was by reason of his disability." *Wagoner v. Lemmon*, 778 F.3d 586, 592 (7th Cir. 2015) (internal quotations omitted). The ADA imposes a duty to provide reasonable accommodations to disabled persons. 42 U.S.C. § 12182(b)(2)(A)(ii) ("[D]iscrimination includes … a failure to

---

[8] This claim raises a "thorny question of sovereign immunity." *Jaros v. Ill. Dep't of Corr.*, 684 F.3d 667, 671–72 (7th Cir. 2012); *see also Morris v. Kingston*, 368 F. App'x 686, 689 (7th Cir. 2010) (observing the Supreme Court "left open the question whether the ADA could validly abrogate sovereign immunity for *non-constitutional* violations"). We need not address this question, though, because we conclude the defendants' accommodations were reasonable as a matter of law.

make reasonable modifications in policies, practices, or procedures."); *see A.H. by Holzmueller v. Ill. High Sch. Ass'n*, 881 F.3d 587, 594 (7th Cir. 2018). To receive compensatory damages, Hildreth must show deliberate indifference, which occurs when defendants "*knew* that harm to a federally protected right was substantially likely and … *failed* to act on that likelihood." *Lacy v. Cook Cty.*, 897 F.3d 847, 862 (7th Cir. 2018) (quoting *Liese v. Indian River Cty. Hosp. Dist.*, 701 F.3d 334, 344 (7th Cir. 2012)).

The key question here is whether Hildreth, given his disability, was able to draft his legal documents, with or without reasonable accommodations from the prison. *See Love v. Westville Corr. Ctr.*, 103 F.3d 558, 560 (7th Cir. 1996). As a result of the Parkinson's disease and its effect on his handwriting, Hildreth requested a typewriter in his cell to draft court documents and correspondence. Because a typewriter is prohibited in a cell, the prison officials instead provided him with an assistant to help him draft documents. They also increased his access to the library to eighteen hours per week where he could use a typewriter. Hildreth's extra library access was withdrawn only when he received an assistant. While not the around-the-clock, easy access Hildreth wants to word processing, or the well-trained writer whom he might like, Hildreth successfully drafted legal documents and never missed a court deadline. Further, he could have asked for more library time, but the record shows no such request.

The question is not whether other modifications could have been made, such as those Hildreth seeks, but whether the accommodations made were reasonable. We conclude they were. The defendants' accommodations allowed Hildreth sufficient time and access to a typewriter to draft and

file documents while taking into account the prison's reasonable security concerns with contraband. *Love*, 103 F.3d at 561 (noting the ADA's "reasonableness requirement must be judged in light of the overall institutional requirements. Security concerns, safety concerns, and administrative exigencies would all be important considerations to take into account" (citation omitted)).

Even if Butler and Oakley failed to make these reasonable accommodations, Hildreth would still not be entitled to damages because he has not shown deliberate indifference. Hildreth admits he has been moved to a different area of the prison where he may now possess a typewriter in his cell. This renders moot his claim for prospective injunctive relief. *See Simic v. City of Chicago*, 851 F.3d 734, 738 (7th Cir. 2017) (noting for a plaintiff to have standing for prospective injunctive relief, he "must face a 'real and immediate' threat of future injury as opposed to a threat that is merely 'conjectural or hypothetical'" (quoting *City of Los Angeles v. Lyons*, 461 U.S. 95, 102 (1983)). So Hildreth can now seek only compensatory damages, provided he shows deliberate indifference. *See Lacy*, 897 F.3d at 862 (7th Cir. 2018) (agreeing with the majority of circuits that "deliberate indifference [is] the proper standard for obtaining compensatory damages" under the ADA). But Hildreth never argued Butler or Oakley were deliberately indifferent and thus cannot recover compensatory damages. Accordingly, we affirm the summary judgment in defendants' favor on the ADA claim.

## III. Conclusion

The district court concluded correctly that Hildreth did not show a widespread practice or custom of the defendant

delaying medication, and that prison officials reasonably accommodated his Parkinson's disease. So we AFFIRM the district court's grant of summary judgment in defendants' favor.[9]

---

[9] Hildreth moved to supplement the record on appeal with an October 10, 2018 letter from the Illinois Supreme Court, which stated the Illinois Supreme Court was returning his petition for leave to appeal because it was "mostly illegible" and requested that Hildreth type or rewrite his petition. Because this letter was not submitted (or in existence) during the district court proceedings, it is not permitted under Federal Rule of Appellate Procedure 10, so we deny this motion.

HAMILTON, *Circuit Judge*, dissenting. Plaintiff Hildreth has offered sufficient evidence that Wexford knew of his serious health needs—which required reliable, timely refills of his Parkinson's medication—and acted unreasonably in response to those needs. Wexford established prescription refill and renewal systems, i.e., policies, that did not include warnings and back-ups to correct inevitable and serious mistakes. That's enough to show deliberate indifference under *Farmer v. Brennan*, 511 U.S. 825, 843–44 (1994), and *Glisson v. Indiana Dep't of Corrections*, 849 F.3d 372, 382 (7th Cir. 2017) (en banc). I respectfully dissent.

I. *Discovery in Future Cases*

Before explaining where the majority opinion errs, however, I must highlight the opinion's obvious implications for discovery in the district courts. Wexford should be careful what it asks for. Its lawyers have won this case, but on theories and arguments that invite—indeed, virtually require—much broader, more intrusive, and more expensive discovery in similar cases. Plaintiffs like Hildreth will need to pursue discovery into the medical care of other prisoners and even into Wexford's personnel records. The need for district courts to recruit counsel in such cases will be even more compelling.

Consider the grounds for Wexford's victory. The first is the simplest. Important evidence is deemed inadmissible hearsay because plaintiff does not have evidence that the speakers, prison nurses whose employment shifted back and forth between Wexford and the Illinois Department of Corrections, were employees of Wexford on the days they made the disputed statements. That's incorrect as a matter of evidence law in two ways: these were not "statements" offered for their truth, and even if they had been, a person can be an

agent of a party under Federal Rule of Evidence 801(d)(2)(D) without being an employee. Nevertheless, other plaintiffs will need to prepare to meet such arguments in other cases. The only fair way to let them meet them, if Wexford or similar prison health-care companies will not stipulate, is to let plaintiffs have access to personnel records. Given Wexford's arguments and the majority opinion's reasoning here, it would be an abuse of discretion to deny such discovery in a similar case.

Second, Wexford argues and the majority opinion agrees that plaintiff does not offer evidence of sufficiently widespread problems with timely refills of critical, life-changing prescriptions at Menard or other prisons where Wexford has contracts. I explain below why I disagree. But if a similar plaintiff must prove that the system in fact fails more frequently, and not just for him, his demands for broad discovery into other inmates' experiences with Wexford and its refill system should be undeniable.

Moreover, a good deal of such evidence appears to be discoverable. Other federal lawsuits provide sources of such evidence and describe prescription refill problems at Menard during times relevant here. See, e.g., First Annual Report of Monitor Pablo Stewart, MD, at 47, *Rasho v. Walker*, No. 07-cv-1298 (C.D. Ill. May 22, 2017) ("Medication orders often expired and the offender may or may not continue receiving his or her medication … . At Menard, psychotropic medication orders were allowed to expire, and often staff did not correct the problem until an inmate had already missed a week or two of medication."); Final Report of the Court Appointed Expert, at 23, *Lippert v. Godinez*, No. 1:10-cv-4603 (N.D. Ill. Dec. 2014) ("In the course of our reviews we noted multiple in-

stances in which patients experienced medication discontinuity for a variety of reasons, yet this went unrecognized and therefore unaddressed by the treating clinicians. Part of the problem seems to be dysfunctional medical record keeping … ."); *Barrow v. Wexford Health Sources, Inc.*, No. 3:14-cv-800, 2017 WL 784562, at *4 (S.D. Ill. Mar. 1, 2017) (plaintiff claimed he did not receive medication prescribed by Wexford physician at Menard in 2014; summary judgment granted for Wexford but denied for physician).

There is evidence that these conditions have persisted for years, with expert findings almost perfectly mirroring Hildreth's experiences. See Report of the 2nd Court Appointed Expert, at 83, *Lippert v. Godinez*, No. 1:10-cv-4603 (N.D. Ill. Oct. 2018) ("We found many examples of patients whose ordered medications were never provided, were delayed starting, and were stopped because the patient had not been seen by a provider to renew medication. Record reviews indicated that appointments for chronic care are not scheduled to take place prior to expiration of chronic disease medication orders."). The expert reports from the *Lippert* litigation excoriate Wexford for its oversight of Illinois prison health care—including the delivery of medication—and the first report was published in December 2014, between plaintiff Hildreth's second and third grievances.

These reports are not in this record, were not raised in these briefs, and are not appropriate subjects for judicial notice. But they may be available in future cases. They would face hearsay objections if offered to prove the matters asserted. See *Wilson v. Wexford Health Sources, Inc.*, 932 F.3d 513, 522 (7th Cir. 2019) (holding district court did not abuse its discretion excluding the Lippert Report when offered as proof

that Wexford provided substandard care). But these reports would be admissible to show corporate *knowledge* of Wexford's policy failings and of the risks that inmates faced. *Daniel v. Cook County*, 833 F.3d 728, 743 (7th Cir. 2016) (holding documents from other jail-condition case were "inadmissible hearsay to the extent they are offered to prove the truth of the statements they contain" but "may be admissible to show that the defendants were on notice of their contents").

In addition, plaintiffs in similar cases should be able to find ways to put these reports (or testimony from their authors) into evidence for the truth of the matters asserted to establish a more extensive record of Wexford's similar failures with other prisoners. And of course, evidence about Wexford's contracts and the financial incentives it faces in delivering, or not delivering, health care to Illinois prisoners would also be relevant in evaluating the company's policies and whether they amount to deliberate indifference to serious health risks. Given the majority opinion's reasoning here, these additional paths of discovery should be available and would potentially be compensable by Wexford in the end. See 42 U.S.C. § 1988. Given the majority opinion's reasoning, it would be an abuse of discretion to deny similar plaintiffs access to these lines of discovery to satisfy the standard applied in this case.

II. *Wexford's Prescription Policies and the Lapses in Hildreth's Prescription*

Returning to this case and this record, plaintiff Hildreth has come forward with evidence that defendant Wexford's policies for renewing and refilling prescriptions reflect deliberate indifference to the serious medical needs of Hildreth himself and other prisoners who depend on reliable refills of

prescriptions for medicines that are not kept on-site at the prison. In reviewing a grant of summary judgment, we view the facts in the light most reasonably favorable to plaintiff as the non-moving party. *Dixon v. County of Cook*, 819 F.3d 343, 346 (7th Cir. 2016).

Hildreth suffers from Parkinson's disease, a neurological disease that causes reduced levels of dopamine in the brain, causing in turn tremors and problems in movement and balance, among other serious symptoms. Parkinson's has no known cure, but medication can help control the symptoms by mimicking the effects of dopamine.

Hildreth needs a drug called Mirapex to manage his symptoms. Without Mirapex, his Parkinson's symptoms return within a day or two, and he suffers from poor balance, stiffness, shaking, fevers, memory problems, and freezing episodes. This leaves him "immobile" and "balled up in bed." Any lapse in medication causes pain and puts him at risk of injury. During one such lapse, he lost his balance and fell in the shower. For Hildreth, the difference between having medication and not having it is "night and day."

As an inmate at the Menard Correctional Center, Hildreth must rely on Wexford—a private health-care contractor—and the Illinois Department of Corrections (IDOC) to provide him with health care, including his Parkinson's medication.[1] Both

---

[1] Since the late 1970s, states have increasingly contracted with private corporations to provide health-care services in prisons. The Pew Charitable Trusts, *Prison Health Care: Cost and Quality* 11 (2017). As of 2015, twenty-eight states either contracted out most health-care delivery services or split responsibility between state employees and contractors. Many states, including Illinois, have a capitated payment model, which means that they pay contractors a fixed per-patient rate for care. *Id.* at 98.

Wexford and IDOC play a role in providing health care, and IDOC employs some health-care workers. Wexford, however, has primary responsibility for overseeing prisoner treatment, including prescribing medication and setting prescription policies. The site medical director at Menard, a Wexford employee, was supposed to provide oversight. During the events of this lawsuit, however, this key position was first vacant, then filled temporarily, occupied briefly by one doctor, and then by another doctor who soon left the position because he was not working the required 40 hours per week and "would leave early."

Wexford treats the Mirapex that Hildreth needs as a "nonformulary medication." This means that the drug is not kept in stock at the prison but is shipped as needed from an outside provider, Boswell Pharmacy Services. Wexford's nonformulary medication refill policy requires a sequence of actions to get the medicine to an inmate. Hildreth receives one month's supply of Mirapex at a time. When he receives the pack of pills, he also receives a sticker that he must turn in to a nurse *at most* seven days before he runs out. After he returns the sticker to a nurse, Wexford is supposed to send the sticker to Boswell. Boswell is then supposed to ship a refill to Menard, and the nursing staff is supposed to deliver the refill to Hildreth. Nurses can be employed by either Wexford or IDOC.

---

Illinois prisons have among the lowest per-inmate staffing and spending levels in the country. In 2015, Illinois had the second-lowest per-inmate staffing and the eighth-lowest per-inmate health-care spending. Its spending of $3,619 per year was 37 percent below the national median. *Id.* at 8, 20.

In addition to the refill policy, Wexford has a prescription renewal policy for inmates like Hildreth with chronic illnesses. Such inmates are supposed to be signed up automatically for clinic visits at least every six months. These visits serve a key function in coordinating care for chronically ill patients and making sure their medical needs are met. At these clinics, patients are seen by a Wexford physician or nurse practitioner who will then write any necessary prescriptions, which will last between six months and one year.

These policies look good on paper, but these are human systems and people make mistakes. Hildreth did not regularly receive passes for the chronic clinic and did not go every six months. Instead, he was seen by doctors at irregular intervals and was sometimes just told that his prescription was being renewed "automatically." At least one time, Hildreth did not receive his medication on time because his prescription had lapsed. Another time, a Wexford nurse refused to accept Hildreth's renewal sticker because "she did not like Scott Hildreth's demeanor."[2]

In effect, Wexford policy relied on what a manufacturer would call "just-in-time" supply control. When a manufacturer relies on such a system, it knows it must monitor progress closely so that mistakes don't shut down the assembly line. When the just-in-time system is used to provide critical medicine, the stakes are even higher. The need for a policy to catch and correct mistakes before they cause harm is greater. Without such elements in the Wexford policy, plaintiff was left without medication he needed to control his Parkinson's

---

[2] The majority opinion treats this statement as inadmissible. Ante at 15. I disagree for reasons explained below.

symptoms for days and sometimes more than a week at a time. As applied, then, the formal policies did not reliably supply Hildreth with his Parkinson's medication. The record contains evidence of at least three medication lapses over a period of nineteen months. In each instance, Hildreth did the only things he could to bring the lapse to the attention of those responsible for his care—speaking to the nurses on duty and filing grievances.

On April 8, 2014, Hildreth filed his first grievance in the record about a medication lapse: "I am out of my Parkinsons meds (AGAIN) … I have serious mobility problems … I've been telling C/Os [correctional officers] and nurses *for days* I did not get refill[.] *I turned in sticker on time*[.] Been without *for days*." (Emphasis added). The next day, Hildreth's prescription was renewed, indicating that the lapse took place because his prescription had expired and had not been renewed on time. The record does not indicate when Hildreth received his refill, but he likely would have gone at least another couple of days because of the turnaround time from Boswell.

On October 25, 2014, he filed another grievance: "I have gone thru this before?! I don't know why I bother with your griev[ance] syst[em]? I am about to run out of my [] Mirapex for Parkison's … I've told the nurses for a couple days now." Hildreth received the medication on October 30, and Hildreth said that this meant he had a lapse of two or three days. Hildreth had become so accustomed to medication delays that he had started preemptively telling nurses about lapses. When he was told to "wait and see" if the medication came in, he would preemptively file a grievance to help ensure that he had only a minimal lapse.

On November 16, 2015, Hildreth filed yet another griev-
ance regarding the same problem: "Been without Parkinsons
meds again! Since Friday 13th. This is why I filed law suit."
He said that he had "told nurses" about the situation, but to
"no avail as usual." This grievance was not reviewed until a
full week later, on November 23. Upon review, the Healthcare
Unit Administrator—an IDOC employee—noted that the
"non-formulary for his meds have expired. The request to
continue use was sent into the pharmacy. We are waiting to
hear back." During this incident, Hildreth went without his
medication for at least ten days. In reviewing the grant of
summary judgment, we must assume that such a long lapse
was exceptionally painful and dangerous for Hildreth. We
must also assume that Hildreth did his part by complying
with Wexford's prescription refill and renewal policies.

III. *Analysis — The Eighth Amendment and Monell*

It's worth remembering why modern federal courts de-
vote so much attention to health care in prisons. "An inmate
must rely on prison authorities to treat his medical needs; if
the authorities fail to do so, those needs will not be met. In the
worst cases, such a failure may actually produce physical 'tor-
ture or a lingering death' … . In less serious cases, denial of
medical care may result in pain and suffering which no one
suggests would serve any penological purpose. The infliction
of such unnecessary suffering is inconsistent with contempo-
rary standards of decency … ." *Estelle v. Gamble*, 429 U.S. 97,
103 (1976) (citations omitted). That's why deliberate indiffer-
ence to inmates' serious medical needs violates the Eighth
Amendment's prohibition on cruel and unusual punishment.
*Daniel v. Cook County*, 833 F.3d 728, 733 (7th Cir. 2016), citing

*Estelle*, 429 U.S. at 104. A plaintiff shows deliberate indifference by establishing that those responsible for inmate health know that an inmate faces a "substantial risk of serious harm" and disregard that risk by "failing to take reasonable measures to abate it." *Farmer v. Brennan*, 511 U.S. 825, 847 (1994).

For claims against municipal governments under 42 U.S.C. § 1983, we apply the familiar *Monell* standard: respondeat superior liability does not apply, and the plaintiff must show instead that the constitutional violation was caused by a municipal policy or a custom or practice so pervasive as to reflect municipal policy. *Monell v. Dep't of Social Services*, 436 U.S. 658, 691 (1978). The Supreme Court has not applied the *Monell* standard to private corporations that act under color of state law, like prison and jail health-care providers. Our precedents have applied *Monell* to such private corporations, though that doctrine has been questioned within the court and the academy. See *Shields v. Illinois Dep't of Corrections*, 746 F.3d 782, 789–90 (7th Cir. 2014).

In this case, the correct focus is on Wexford's systems (i.e., its policies) for prescription refills and renewals. *Monell* liability may apply even in the absence of individual liability where the institutional policies themselves show deliberate indifference to inmates' serious medical needs. *Glisson v. Indiana Dep't of Corrections*, 849 F.3d 372, 378 (7th Cir. 2017) (en banc) (contractor chose not to provide for coordinated care for prisoners with multiple, complex illnesses); see also *Daniel*, 833 F.3d at 733–34 ("individual defendants can defend themselves by shifting blame to other individuals or to problems with the 'system,' particularly where no one individual seems to be responsible for an inmate's overall care").

This doctrinal niche is often relevant in prison health-care cases, particularly where health care is delivered by a combination of government employees and a private contractor like Wexford. The combination diffuses responsibility between government and contractor and among many individuals. Inmates can suffer because of health-care providers' lack of policy, systematic failures to follow official policy, or obvious gaps in policy. E.g., *Glisson*, 849 F.3d at 378; *Daniel*, 833 F.3d at 735; *Thomas v. Cook County Sheriff's Dep't*, 604 F.3d 293, 303 (7th Cir. 2010). In such cases, it may be that no facially unconstitutional policy tells employees to take actions that violate someone's constitutional rights. Instead, the government or its contractor adopts or tolerates practices that predictably lead to constitutional harms.

A. *Evidentiary Dispute*

I need to address briefly the erroneous exclusion of evidence that helps demonstrate why Wexford's system needs to have warning systems and back-ups. In opposing summary judgment, Hildreth offered an affidavit from another inmate, Michael McGowan, who testified that he overheard two relevant conversations. In October 2015, Susan Kirk—a nurse who McGowan believed worked for Wexford—refused to accept Hildreth's medication refill sticker, "indicating she did not like Scott Hildreth's demeanor." In a second encounter, Angie Walters—another nurse who McGowan believed worked for Wexford—refused to check on the status of Hildreth's medication refill when he reported that he had run out. The district court excluded McGowan's testimony about these statements as hearsay, and the majority opinion upholds those rulings.

As a matter of elementary evidence law, this is just clearly wrong. Hildreth did not offer the affidavit to prove that what the nurses said was true. He offered the affidavit to prove their *actions*. One nurse refused to accept plaintiff's refill sticker. The other refused to check on the status of his refill when he had already run out. The conversations were not hearsay at all but instead verbal acts—refusals—falling completely outside the definition of hearsay in Federal Rule of Evidence 801(c): an out-of-court "statement" offered "to prove the truth of the matter asserted in the statement." See *Carter v. Douma*, 796 F.3d 726, 735 (7th Cir. 2015) (informant request for drugs was not hearsay because it was a verbal act); *Schindler v. Seiler*, 474 F.3d 1008, 1010 (7th Cir. 2007) (verbal acts are not hearsay because they "are not offered for their truth"); see generally 30B Wright & Bellin, Federal Practice & Procedure, Evidence § 6722 at 66 (2017). The affidavit was offered as evidence that the system (read, policy) that Wexford had designed could fail and did fail plaintiff because of eminently human failings like impatience and perhaps spite. The affidavit offered admissible evidence to oppose summary judgment.[3]

---

[3] The parties have skipped the "statement" issue and debated whether Federal Rule of Evidence 801(d)(2)(D) should apply. It excludes from the definition of hearsay statements by an opposing "party's agent or employee on a matter within the scope of that relationship and while it existed." As noted above, the debate on this issue shows the need for broader discovery into Wexford's or similar contractors' personnel files to determine who employed the nurses at the relevant times. The only evidence is that the affiant said that he believed they were Wexford employees. Wexford obviously has records that could settle that issue, but it has not come forward with them. Future plaintiffs facing similar gamesmanship will have to obtain personnel records to prepare to meet such arguments. At a more fundamental level, however, *employment* is not the issue. *Agency* is

B.  *Unreasonable Response to Danger of Inevitable Mistakes*

Hildreth has presented sufficient evidence of a *Monell* policy or custom for his claim to survive. A jury could conclude that "the failure to establish adequate systems" for providing essential medication "was so pervasive that acquiescence on the part of policymakers was apparent and amounted to a policy decision." *Daniel*, 833 F.3d at 734, citing *Dixon v. County of Cook*, 819 F.3d 343, 348 (7th Cir. 2016). Hildreth has identified a policy—or rather, a network of policies and key policy gaps—that can form the basis of Wexford's Eighth Amendment liability. The issue is not exactly how often the policy failed Hildreth. The issue is whether the system established by Wexford policymakers reflected deliberate indifference to the inevitability of human mistakes.

A prisoner asserting a deliberate-indifference claim must show that the defendant had actual knowledge of the danger or serious condition the prisoner faced, and that the defendant failed to take reasonable steps in the face of the risk. *Farmer v. Brennan*, 511 U.S. 825, 843–44 (1994); *Ortiz v. Jordan*, 562 U.S. 180, 190 (2011) (reinforcing *Farmer's* reasonableness requirement); *LaBrec v. Walker*, 948 F.3d 836, 841 (7th Cir.

---

the issue. See, e.g., *Mister v. Northeastern Illinois Commuter R.R. Corp.*, 571 F.3d 696, 698 (7th Cir. 2009); *United States v. Swan*, 486 F.3d 260, 264–65 (7th Cir. 2007); *Young v. James Green Mgmt., Inc.*, 327 F.3d 616, 622 (7th Cir. 2003). The majority opinion further speculates that the statements may not have been within the scope of the nurses' employment (or agency). Ante at 15. Even Wexford didn't try to make this argument, and it's hard to imagine how these statements or actions by nurses responsible for refilling prescriptions and dispensing drugs could fall outside the scope of their agency or employment. See *Thomas*, 604 F.3d at 309–10 (prison nurse's statement that an ill inmate was "just dope sick" was "not hearsay" under Rule 801(d)(2)(D)).

2020); *Glisson*, 849 F.3d at 381. The Supreme Court explained in *Farmer* that a plaintiff can prove actual knowledge with circumstantial evidence, of course, and that the very obviousness of the danger can support an inference of actual knowledge. 511 U.S. at 842; see also *LaBrec*, 948 F.3d at 841 (citing *Farmer*); *Petties v. Carter*, 836 F.3d 722, 729 (7th Cir. 2016) (en banc) ("If a risk from a particular course of medical treatment (or lack thereof) is obvious enough, a factfinder can infer that a prison official knew about it and disregarded it.").

Hildreth has offered evidence to satisfy this demanding standard. Ample evidence showed that Wexford had actual knowledge of Hildreth's Parkinson's disease, his prescription, and the need to ensure a steady supply of the medicine. Wexford surely had actual knowledge that some prisoners would have similarly urgent needs for critical prescriptions not available on-site at the prison. Given that actual knowledge of serious medical needs, Wexford had a constitutional duty to take reasonable steps to avoid or minimize the risk of lapses in medication. In other words, Wexford had a constitutional duty to put in place a reasonably reliable system for renewing and refilling such critical non-formulary drugs and to monitor the performance of that system.

A jury could easily find that Wexford's system was not reasonably calculated to be reliable because the system had no warning channel and back-up mechanisms by which it could fix mistakes without unnecessary suffering. Wexford's system is not required to be perfect and fail-safe. But for a system so critical to health—and one with many possible points of failure—it lacked warnings to alert Wexford to inevitable mistakes or oversights. This not only prevented Wexford

from catching mistakes before patients suffered but apparently prevented Wexford from learning about even repeated failures. Such an unreasonable "conscious decision not to take action" in the face of a serious medical risk is akin to the decision of the defendant in *Glisson* to forgo a protocol for coordinated care to chronically ill inmates. 849 F.3d at 381. Where there is an obvious risk created by a health-care policy gap—like coordinated care in *Glisson* or medication refill oversight here—a plaintiff need not show some minimum number of injuries to prevail. *Id.* at 382, citing *Woodward v. Correctional Medical Services*, 368 F.3d 917, 929 (7th Cir. 2004) ("CMS does not get a 'one free suicide' pass.").

Compare Hildreth's situation to that of a hospital patient on a ventilator that is keeping the patient alive. The machine runs on electricity. Electrical power will be interrupted from time to time by storms and equipment failures. Machines like ventilators occasionally break down. Any reasonable hospital must anticipate the possibility of those interruptions and breakdowns, and it must have alerts and a back-up system in place. Similarly here, Wexford may be deemed to have actual knowledge of both the obvious possibility, even the inevitability, of mistakes or lapses in its renewal and refill systems and of the serious consequences for patients if those were not corrected. Wexford thus had a constitutional duty to take reasonable steps—warnings and back-up systems—to mitigate the effects of inevitable mistakes and oversights.

In Hildreth's case, Wexford's system for providing medication led to a series of serious delays in providing him with his medication—at least three times in nineteen months. Each time this happened, we must assume, Hildreth did every-

thing he could to avoid the problem and then to make Wexford aware of it. He told the nurses and filed formal grievances. In these grievances, he said that this was an ongoing problem and that the nurses were not responsive to his needs. The longest lapse in medication—at least ten days—occurred after he had recently submitted two grievances related to other lapses.

Wexford argues that Hildreth's grievances cannot be used to infer that it knew about the systemic failure of its medication policies and that this precludes liability:

> Wexford is not involved in the grievance process, and would not know of the contents of a grievance unless an IDOC employee notifies Wexford about it. Even then, that individual would have been a member of the onsite healthcare staff, not necessarily a policymaker. As such, Wexford policymakers had no reason to know that any alleged issue existed.

Brief for Appellee Wexford at 21. This argument has things exactly backwards: Wexford's lack of involvement in the grievance process makes it *more* culpable and *strengthens* Hildreth's claim. Humans make mistakes. In implementing systems known to be critical to life, health, and safety, a company like Wexford must allow for such mistakes and take reasonable steps to provide warnings and back-up systems. Federal courts do not and should not design the specifics. As noted, though, the Eighth Amendment requires reasonable responses to known risks where prisoners cannot protect their own health and safety. Wexford's admission that it lacked any policy to learn about inmates' complaints supports the conclusion that its prescription policies created an unacceptable

risk of harm resulting from this form of deliberate indifference to Hildreth's serious medical needs.

*Daniel v. Cook County* addressed this point: "If a grievance system is part of a jail's or prison's system for communicating and responding to health care requests, and if the system fails in a way that causes a deprivation of needed health care, then the problem with the grievance system may be an important part of the plaintiff's case for deliberate indifference to his health care needs." 833 F.3d at 737. We have also said, of course, that "the dangers of delayed responses to medical requests are readily apparent." *Thomas*, 604 F.3d at 304. In the face of such danger, it is unreasonable for a medical policymaker to cut itself off from important feedback about failures or lapses in its policies.

Dividing responsibility between private contractors and state agencies can increase these risks. In such cases, the law should and does provide incentives for actors to take reasonable steps to mitigate known dangers. The law should not do what the majority opinion's reasoning does here: reward divided responsibility and deliberate ignorance by those who control prisoners' only access to health care. Hildreth's grievances give the impression of a person in pain, screaming into a void. Wexford ignored Hildreth's grievances, seemingly by design. And when Hildreth used the only other avenue available—communication with nurses—he was told only to "wait and see" if the refill would come. On this record, we should reverse summary judgment for Wexford.

C. *The Majority Opinion's Approach to Custom*

The majority opinion adopts a highly restricted approach to establishing a *Monell* custom that is at odds with our precedent. The majority looks only to the raw number of alleged failures and the time period over which they took place. Ante at 11–13. It views the broader policy decisions and context surrounding the violations as immaterial. This approach divorces the legal doctrine from its purpose of identifying those cases in which a government or corporate policy causes and fails to address predictable failures to provide needed medical care. After acknowledging that we have adopted no "bright-line rules" for establishing a *Monell* custom, the majority opinion adopts one by saying that the number of possibly unconstitutional incidents "must be more than three." Ante at 11.

There are at least two problems with the approach. First, Hildreth does not present the kind of pure custom case where institutional culpability is inferred solely from repeated employee misconduct and the question is whether the corporation can be held liable for tolerating them. While Hildreth uses the term "custom" in his briefing—presumably because he asks us to infer something from the repeated medication lapses he experienced—his theory of *Monell* liability implicates both official policies and unofficial customs. Hildreth specifically points to Wexford's admission that it is "not involved in the grievance process" as evidence of its deliberate indifference. He asks us to infer from Wexford's medication refill policy, its prescription renewal policy, a pattern of noncompliance with each of those policies, a pattern of medication lapses, and—importantly—the utter failure of Wexford to provide a functioning pathway to fix these problems, that

Wexford tolerated "systematic and gross deficiencies" in its process for providing inmates with medication. *Dixon*, 819 F.3d at 348. And as described above, the lack of a policy for reporting and correcting failures—undoubtedly a failing attributable to Wexford itself rather than a rogue employee—should be decisive.

Second, even when addressing what could be called pure custom cases, we have never held that some minimum number of incidents is needed to establish municipal liability. Rather, the question is one of corporate knowledge and responsibility, as is always the case under *Monell*. "[M]unicipal liability can … be demonstrated indirectly 'by showing a series of bad acts and inviting the court to infer from them that the policymaking level of government was bound to have noticed what was going on.'" *Woodward*, 368 F.3d at 927, quoting *Estate of Novack v. County of Wood*, 226 F.3d 525, 530 (7th Cir. 2000). The majority opinion's per se rule is at odds with our approach to *Monell*, which focuses broadly on indicia of municipal or corporate responsibility rather than just the number of incidents. E.g., *Dixon*, 819 F.3d at 348 ("[W]e look to see if a trier of fact could find systemic and gross deficiencies in staffing, facilities, equipment, or procedures in a detention center's medical care system.") (internal quotation marks omitted); *Daniel*, 833 F.3d at 734 ("[A]n inmate can meet this burden by offering 'competent evidence tending to show a general pattern of repeated behavior (i.e., something greater than a mere isolated event).'"), quoting *Davis v. Carter*, 452 F.3d 686, 694 (7th Cir. 2006). As we said in *Woodward*, a prison health-care company "does not get a 'one free suicide' pass." 368 F.3d at 929.

*Grieveson v. Anderson*, 538 F.3d 763 (7th Cir. 2008), which the majority opinion treats as controlling, is easily distinguishable. An inmate alleged that the jail maintained a customary practice of failing to distribute inmate prescriptions properly after four instances in which his entire prescription was distributed at once and then stolen by other inmates. *Id.* at 774. We held that these four incidents were insufficient to establish a custom. *Grieveson* differs in two critical ways from this case: the inmate complained to the prison officials only once, and the inmate did not allege widespread noncompliance with official policy. Here, by contrast, Hildreth filed at least three grievances and made even more frequent complaints to nurses where Wexford's system failed, and nothing happened. And he described frequent noncompliance with Wexford's refill and renewal policies. Wexford's just-in-time refill system left little room for mistakes, and such a system demands warnings and back-ups where health and safety are at stake. The repeated and foreseeable mistakes in refilling Hildreth's prescription and the failure to respond to his complaints make for a much stronger case of systemic deficiencies here than in *Grieveson*.

I would reverse and remand for trial, and I would add a strong suggestion that Hildreth be permitted to pursue additional discovery to expand the evidence of deliberate indifference.